MARTIN T. CONROY *et al.*, Plaintiffs-Appellants, v. ANDECK RE-
SOURCES '81 YEAR- END LTD. *et al.*, Defendants-Appellees.

First District (4th Division)   No. 84—1704

Opinion filed October 10, 1985.

Lange & Lange and Sonnenschein, Carlin, Nath & Rosenthal, both of Chicago (Bruce R. Lange, Patricia K. Hogan, David C. Jacobson, and Steven M. Levy, of counsel), for appellants.

Mayer, Brown & Platt and Jenner & Block, both of Chicago (Percy L. Angelo, Mar, Erich Weber, Rosanne J. Faraci, Jerold S. Solovy, Keith F. Bode, and Joel T. Pelz, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

Plaintiffs, purchasers of a private offering of securities, filed a multicount complaint against defendants, securities sellers and the Oklahoma law firm representing them, seeking (1) in count I rescission of the sale pursuant to section 13 of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1981, ch. 121½, par. 137.13) for failure to register the sale, and (2) charging in count II negligence against defendant law firm for its failure to register the transaction.

Defendant sellers moved to dismiss count I of the complaint, maintaining that, based largely on plaintiffs' previous trades of fu-

tures contracts based on financial instruments (financial futures), plaintiffs were "dealers" in securities and the sale to them therefore fell within the sale to dealers registration exemption. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.4(C).) Defendant law firm moved to quash summons and dismiss counts I and II for lack of personal jurisdiction.

The trial court granted both defendants' motions, and plaintiffs' appeal, asserting that (1) because financial futures are not "securities" they are not "dealers" in securities, and the exemption does not apply, and (2) that the law firm's failure to register the sale was a jurisdictional act sufficient to bring it within the scope of the Illinois long-arm statute (Ill. Rev. Stat. 1981, ch. 110, par. 2—209).

We affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND

In December 1981, plaintiffs Martin T. Conroy, Francis X. O'Donnell, John Burrell, and Thomas Gorman, purchased as a private securities offering units in the oil and gas limited partnership of defendant, Andeck Resources '81 Year-End Ltd. (Andeck). Andeck retained defendant, McAfee and Taft (McAfee), an Oklahoma law firm, to perform legal services in connection with the sale, including the preparation of a private placement memorandum.

Plaintiffs are all full and regular members of the Chicago Board of Trade (CBOT), a registered futures exchange and contract market, not a registered securities exchange. Plaintiffs are in the business of trading commodities futures on the CBOT and, prior to the Andeck sale, all have traded both agricultural and financial futures, *i.e.*, contracts for the future sale or purchase of U.S. Treasury Notes and Bonds. Both O'Donnell and Burrell are registered with the Securities Exchange Commission (SEC), the Federal regulatory agency that administers the Securities Exchange Act and has jurisdiction over dealings in securities, as "broker-dealers" and have exercised their automatic right to become members of the Chicago Board Options Exchange (CBOE), a national securities exchange. From October 1981 through 1982 O'Donnell made a series of securities trades from his own account on the CBOE. None of the plaintiffs are registered as a "dealer" in securities with the Illinois Secretary of State.

Sometime subsequent to the Andeck sale, McAfee obtained a 4G report of sale form from the office of the Illinois Secretary of State in order to register the Andeck units. In 1983, plaintiffs learned that the units had never been registered in Illinois.

Pursuant to section 13 of the Illinois Securities Law of 1953 (Ill.

Rev. Stat. 1981, ch. 121½, par. 137.13), plaintiffs, upon learning that the units had not been registered, elected to rescind the sale, notified Andeck of their election, and tendered back the limited partnership units. Plaintiffs then filed a multicount complaint seeking rescission and alternate relief against Andeck and Andeck's legal counsel, McAfee.

Defendant McAfee filed a special and limited appearance and, in conjunction, a motion to quash summons and dismiss counts I and II of the complaint for want of personal jurisdiction. A hearing on McAfee's motion was held, and it was denied. McAfee then filed a motion for reconsideration. Following the reconsideration hearing, the trial court, in an order entered June 8, 1984, reversed its former ruling, finding that the legal services McAfee performed for Andeck in Oklahoma did not constitute such jurisdictional acts as to bring the nonresident defendant within the personal jurisdiction of the Illinois courts and, accordingly, granted McAfee's motion to dismiss.

Defendant Andeck similarly filed a motion to dismiss count I of the complaint, asserting that plaintiffs were "dealers" in securities under Illinois law and that, consequently, the sale to plaintiffs of the Andeck units fell within the sale to dealers exemption from registration set forth in section 4(C) of the Illinois Securities Law and was therefore not subject to rescission. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.4(C).) The trial court, finding that plaintiffs were "dealers" under the Illinois Securities Law and that the sale to them of the Andeck units was therefore exempt from registration, granted Andeck's motion and dismissed with prejudice count I of plaintiff's complaint.

Plaintiffs moved for reconsideration, and on reconsideration, the Chicago Board of Trade moved for leave to intervene. The CBOT's motion was denied, but leave to file an *amicus* brief was granted. The trial court then conducted a hearing for reconsideration, during which arguments by the parties and the CBOT were heard. After taking the matter under advisement, the trial court, on June 20, 1984, entered a written order, dismissing with prejudice count I, for rescission, of plaintiffs' amended complaint. The order contained the special finding pursuant to Supreme Court Rule 304(a) (73 Ill. 2d R. 304(a)), certifying that there was no just reason for delaying enforcement of or appeal from the order.

Plaintiffs take the instant interlocutory appeal from the trial court's orders of June 8 and June 20, 1984, respectively dismissing counts I and II against defendant McAfee and dismissing with prejudice count I for rescission against defendant Andeck.

OPINION

I

The instant appeal presents this reviewing court with two issues: (1) whether plaintiffs are entitled to the statutory remedy of rescission set forth in section 13 of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1981, ch. 121½, par. 137.13), and (2) whether any act or omission to act by McAfee in connection with the Andeck sale was sufficient to bring the non-resident defendant within the purview of the Illinois long-arm statute (Ill. Rev. Stat. 1981, ch. 110, par. 2—209). We will address each of these issues in turn.

PLAINTIFFS' RIGHT TO RESCISSION

The foundational inquiry here, as recognized by the able trial court, is whether plaintiffs are "dealers" under the Illinois Securities Law so as to exempt from the Act's registration requirements the sale of Andeck units, thereby precluding plaintiffs' right to rescission. Section 2.7 of the Illinois Securities Law of 1953 defines a "dealer" as follows:

> "Sec. 2.7. 'Dealer' means any person, other than a salesperson, or controlling person and other than a bank organized under the banking laws of this State or of the United States or other than a trust company organized under the laws of this State, who engages in this State, either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, selling, buying and selling, or otherwise dealing or trading in *securities* issued by another person." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 121½, par. 137.2—7.

Both the parties and the CBOT acknowledge that the definition of "dealer" set forth in the Act clearly contemplates that without engaging in "securities" dealing activity, no person may be deemed to be a "dealer." The determinant factor is, therefore, whether plaintiffs, prior to the sale of the Andeck units, had engaged in securities dealing activity. The trial court concluded that they had.

Based largely on (1) plaintiffs having dealt in financial futures contracts in the past, on (2) their memberships in the CBOT and their memberships in or automatic right to belong to and trade on the CBOE, and (3) by virtue of their registration with the SEC as "broker-dealers," the trial court concluded that plaintiffs were all "dealers" in securities under Illinois law such that the transaction at issue was exempt from registration. We must individually examine each of the bases on which the trial court made its determination.

## II

■ The major thrust of the trial court's decision was its finding that financial futures contracts, contracts for the future sale or purchase of a financial instrument (7 U.S.C. sec. 2 (1976)), are securities rather than commodities. The trial court based its finding on a distinction drawn between futures contracts based on traditional commodities and futures contracts where the underlying commodity is a security, here, U.S. Treasury notes and bonds. Thus, the court found that it is the underlying commodity rather than the futures contract itself that determines the nature of the transaction at issue. The legislative history and statutory language of the Commodity Exchange Act and the 1974 and 1978 amendments thereto (7 U.S.C. sec. 1 et seq. (1976 & Supp. 1985)), as well as the unambiguous wording of that provision of the Illinois Securities Law of 1953 which defines the term "security" (Ill. Rev. Stat. 1981, ch. 121½, par. 137.2—1) convinces us that the distinction relied on by the trial court, though not unprecedented, is, for the following reasons, erroneously drawn.

Prior to 1974, the Commodity Exchange Act (CEA) of 1936 applied only to transactions involving certain agricultural commodities. (7 U.S.C. sec. 2 (1970).) In 1974, the CEA was extensively amended by the Commodity Futures Trading Commission Act, which expanded the definition of "commodity" to include "all other goods and articles ***, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in ***." 7 U.S.C. sec. 2 (1976).

The legislative history of the 1974 amendments shows that one of the purposes of the enlarged definition of commodity was to encompass the futures markets that were expected to be expanded to cover nontraditional goods and services, such as futures contracts based on financial instruments. (S. Rep. No. 850, 95th Cong., 2d Sess. 13, reprinted in 1978 U.S. Code Cong. & Ad. News 2087, 2101.) "Specifically, Congress was aware in 1974 that proposals for futures trading in financial instruments and Government securities were being developed." S. Rep. No. 850, 95th Cong., 2d Sess. 10, reprinted in 1978 U.S. Code Cong. & Ad. News 2110.

Another purpose of the 1974 amendments was to provide a uniform regulatory structure covering all futures trading in both the regulated or conventional and previously unregulated or nonconventional commodities. (S. Rep. No. 850, 95th Cong., 2d Sess. 10, reprinted in 1978 U.S. Code Cong. & Ad. News 2087, 2098.) The Senate Committee reviewing the 1974 amendments to the CEA in 1978 recognized that futures trading is functionally different from securities trading and

averred that, given the unique economic role of futures transactions, regulatory control over futures trading was not intended to be shared. (Van Wart, *Preemption & the Commodity Exchange Act,* 58 Chi. Kent L. Rev. 657, 713 (1982).) The legislature's intent that a single expert agency have the authority and responsibility for administering Federal regulatory policy governing all futures trading was evinced by the creation of the Commodity Futures Trading Commission (CFTC), the exclusive regulatory agency to enforce and administer the provisions of the CEA. (7 U.S.C. sec. 4a (1976).) The exclusive jurisdiction of the CFTC was affirmed by the 1978 amendments to the CEA. S. Rep. No. 850, 95th Cong., 2d Sess. 10, *reprinted in* 1978 U.S. Code Cong. & Ad. News 2087, 2101.

The jurisdiction of the CFTC was intended to encompass futures contracts for both traditional and nontraditional commodities, such as those where the underlying commodity is a security. This intention is spelled out clearly and repeatedly in the legislative history of the CEA:

> "The [Senate Committee on Agriculture, Nutrition, and Forestry] has followed with interest the changing nature of futures markets. The nature of the underlying commodity is not an adequate basis to divide regulatory authority. Further, the fact that a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC. *So long as the futures contract serves a legitimate function, Congress has vested the Commodity Futures Trading Commission with jurisdiction.*" (Emphasis added.) S. Rep. No. 850, 95th Cong., 2d Sess. 22, *reprinted in* 1978 U.S. Code Cong. & Ad. News 2087, 2110.

The intention was again affirmed by the words of Senator Talmadge, who, in rejecting the position that the agency that is responsible for regulating or issuing the *commodity on which a futures contract is written is the one who should regulate that futures contract,* noted that *"a futures contract is a futures contract regardless of what the underlying commodity may be.* The regulation of futures contracts, likewise, is not dependent on the underlying commodity on which the futures contract is written." (Emphasis added.) 124 Cong. Rec. 20, 353 (1978).

Despite the seemingly clear intent of the drafters of the CEA and the amendments thereto, heated jurisdictional disputes between the SEC, the securities oversight agency, and the CFTC, the commodities oversight agency, over the regulation of securities derivative futures

contracts continued to arise. In 1981, a jurisdictional accord between the two regulatory agencies was announced as a practical effort to quell these disputes over the regulation of futures based on securities. In addition to affirming the CFTC's jurisdiction over traditional commodities-based futures, the accord provided for exclusive CFTC jurisdiction over futures based on individual exempted securities, such as U.S. Treasury Bonds and Notes. Ketchum, *Recent Developments in the Regulation of Financial Futures and New Products: SEC Regulatory Issues*, ALI-ABA Course of Study Broker-Dealer Regulation (January 12-13, 1984).

In 1982, the accord was enacted into law and later codified as section 2a of the CEA, which provides:

"This Act *** shall apply to and the [CFTC] shall have exclusive jurisdiction with respect to accounts, agreements *** and *transactions involving*, and may designate a board of trade as a contract market in, *contracts of sale *** for the future delivery of a group or index of securities* (or any interest therein or based upon the value thereof) ***." (Emphasis added.) 7 U.S.C. sec. 2a (Supp. 1985).

It is clear, both from the legislative history of the CEA and the amendments thereto and from the literal wording of these statutes that the legislature intended that all futures contracts, regardless of the nature of the underlying commodity, are to be governed by the provisions of the CEA, fall within the exclusive jurisdiction of the CFTC, and, regarded and treated as commodities rather than securities.

Defendant Andeck relies upon, as did the trial court, *Fisher v. Dean Witter Reynolds, Inc.* (E.D. Pa. 1981), 526 F. Supp. 558, and *Paine, Webber, Jackson & Curtis, Inc. v. Conaway* (N.D. Ala. 1981), 515 F. Supp. 202, to support the position that it is the underlying commodity rather than the futures contract that determines the nature of the transaction. Both *Fisher* and *Paine, Webber*, however, involved alleged violations of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. sec. 78j(b) (1976)), which provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \*

(b) To use or employ, *in connection with the purchase or sale of any security* ***." (Emphasis added.)

The *Fisher* court correctly interpreted Rule 10b—5 as applying "not only to a direct purchase of a security, but also *to contracts* to buy

securities at a future date." (526 F. Supp. 558, 559.) The court then concluded that both U.S. Treasury bills and GNMA certificates are indeed securities.

We agree with both the conclusions reached in *Fisher*. However, neither the fact that a transaction may be subject to SEC Rule 10b—5, which prohibits fraud and misrepresentation *in connection with* the purchase or sale of any security, when the underlying commodity is a security; nor the fact that U.S. Treasury notes are themselves securities compels the conclusion that futures contracts based on U.S. Treasury notes are securities. The broad wording of Rule 10b—5 allows that a transaction need only be the purchase or sale of a security to support an allegation of fraud. Where the commodity underlying a futures contract is a security, any allegedly fraudulent conduct in connection with the purchase or sale of that futures contract will necessarily be "in connection with" a security. It does not logically follow that a futures contract based on a security is itself a security. As the court explained in *Paine, Webber, Jackson & Curtis, Inc. v. Conaway* (N.D. Ala. 1981), 515 F. Supp. 202, 210, the fact that the underlying commodity is a treasury bill, itself a security, makes a difference only "as to the alleged Rule 10b—5 violation." It does not, however, transform the contract *in toto* into a security.

We find that *Fisher* and *Paine, Webber* stand for the proposition that the fact that the underlying commodity is a security may make a transaction subject to SEC Rule 10b—5 violations, and nothing more. (S. Jaffe, Broker-Dealers & Securities Markets 11-12 (Supp. 1985).) Because count I for rescission does not involve Rule 10b—5 violations, the trial court's reliance on *Fisher* is here misplaced.

While the Illinois Securities Law of 1953 does not explicitly define the term "commodity," it does specifically exempt any commodity futures contracts offered or sold to the public on a registered contract market from its definition of "security," which includes "any note, stock, treasury stock, bond, \*\*\* or any other right to purchase or sell a contract for the future delivery of any commodity offered or sold to the public *and not on a registered contract market* \*\*\*." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 121½, par. 137.2—1.

Plaintiffs are in the business of trading futures contracts on the Chicago Board of Trade (CBOT). The CBOT is a registered contract market, designated as such pursuant to the provisions of the CEA and under the jurisdiction of the CFTC. Therefore, the commodity futures trading activities conducted at the CBOT do not fall within the ambit of the definition of "security" set forth under section 2.1. Moreover, because Congress, through the legislative history and literal wording of

the CEA and the amendments thereto, has clearly manifested its intention to supersede State regulation of commodities trading, under the preemption doctrine the trial court is precluded from holding that financial futures are securities. Van Wart, *Preemption & the Commodity Exchange Act,* 58 Chi. Kent L. Rev. 657 (1982).

Based on the foregoing analysis, we find that the trial court erred in finding that futures contracts based on financial instruments are "securities" pursuant to the Illinois Securities Law.

### III

A second factor the trial court considered in determining that plaintiffs are "dealers" in securities under the Illinois Securities Law of 1953 is their membership in the Chicago Board of Trade, which carries with it an opportunity to become a member of the Chicago Board Options, a national securities exchange. All plaintiffs are full and regular members of the CBOT, plaintiff O'Donnell is a member of the CBOE, and plaintiff Burrell was at one time a member of the CBOE but was suspended. Only O'Donnell traded securities on the CBOE.

■ The CBOT is a designated contract market regulated by and under the jurisdiction of the CFTC. (7 U.S.C. sec. 1 *et seq.* (1982).) The CBOE is registered as a national securities exchange, regulated by and under the jurisdiction of the SEC. (15 U.S.C. sec. 78a *et seq.* (1982).) The CBOT was instrumental in organizing and developing the CBOE and, in recognition of those efforts, the CBOE included in its certificate of incorporation a special provision conferring entitlement to membership in the CBOE on CBOT members. (*Buckley v. Chicago Board Options Exchange, Inc.* (1982), 109 Ill. App. 3d 462, 440 N.E.2d 914.) Thus, members of the CBOT have an automatic right to become members of the CBOE, a right they may or may not choose to exercise. Plaintiffs O'Donnell and Burrell chose to exercise that right and, at sometime prior to the Andeck sale, became members of the CBOE. Exercising right to membership does not, however, equate with trading at the CBOE. Only plaintiff O'Donnell has both exercised his membership right and traded at the CBOE.

In order to be a member of the CBOE, one must be actively engaged in "the securities *or* commodities business." (Constitution & Rules, Chicago Board Options Exchange, Inc. par. 2052, R.3.2 (1984).) Plaintiffs are admittedly in the business of commodities trading. Commodities are traded at the CBOT and active engagement in the commodities business is sufficient for membership in the CBOE. To be deemed a "dealer" under Illinois Securities Law, however, one must deal or trade in "securities." Thus, mere membership in the CBOT or

merely exercising the automatic right to membership in the CBOE without engaging in securities trading does not satisfy the definition of a "dealer" set forth in section 2.7 of the Illinois Securities Law (Ill. Rev. Stat. 1981, ch. 121½, par. 137.2—7).

## IV

■ Another factor considered by the trial court in determining that plaintiffs are "dealers" under the Illinois Securities Law is the registration of plaintiffs Burrell and O'Donnell as broker-dealers with the SEC. The issue before this court, as was the issue before the trial court, is whether, as in the case of membership in the CBOT and the CBOE, mere registration with the SEC constitutes engaging in securities dealing or trading activity. We find that it does not.

Plaintiffs Burrell and O'Donnell chose to exercise their automatic right to membership in the CBOE. Individual memberships in the CBOE are conditioned on registration as brokers or dealers pursuant to section 15 of the Securities Exchange Act of 1934 or association with registered brokers or dealers. (Constitution & Rules, Chicago Board of Options Exchange, Inc. par. 2052, R.3.2 (1984).) Section 15 of the Securities Exchange Act defines the term "dealer" as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, *but does not include a bank, or any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business.*" (Emphasis added.) (15 U.S.C. sec. 78c(a)(5) (1982).) The Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others ***." (15 U.S.C. sec. 78c(a)(4) (1982).) These definitions are consistent with the definition of "dealer" under the Illinois Securities Law of 1953 wherein one must be "in the business of *** dealing or trading in securities ***." (Ill. Rev. Stat. 1981, ch. 121½, par. 137.2—7.) The crucial phrase in all three definitions is "in the business."

Mere registration with the SEC as a broker-dealer is not synonymous with engaging in the business of dealing or trading securities. An individual could conceivably register with the SEC and never engage in trading or dealing on the exchange. The record before us provides undisputed support for this position in the affidavit of plaintiff Burrell who, though admittedly registered as a "broker-dealer" with the SEC, has never directly dealt in securities on the CBOE or elsewhere, either for his own account or for that of anyone else. Defendant Andeck takes issue with this statement only insofar as it asserts that financial futures are securities. Having found that future contracts based on finan-

cial instruments are not "securities" under the Illinois Securities Law, and finding no counteraffidavit, the well-alleged facts in Burrell's affidavit are undisputed.

Where well-alleged facts within an affidavit are not contradicted by counteraffidavit, they must be taken as true, notwithstanding the existence of contrary averments in the adverse party's pleadings. (*Kutner v. DeMassa* (1981), 96 Ill. App. 3d 243, 421 N.E.2d 231.) Burrell has alleged that he has never directly dealt in securities on the CBOE or elsewhere. As evidence of this, he ceased paying dues to the CBOE and was suspended from membership on that exchange. The record discloses no counteraffidavit to contradict these facts nor any other evidence to show that Burrell is "in the business of" dealing or trading securities. We therefore find that Burrell's registration with the SEC is, in and of itself, insufficient to confer on him dealer status.

## V

Plaintiff O'Donnell is also registered as a broker-dealer with the SEC. Like Burrell, O'Donnell exercised his automatic right, by virtue of his membership in the CBOT, to become a member of the CBOE. Unlike Burrell, O'Donnell has admittedly engaged in a series of trades on the CBOE. These trades occurred from October 1981 through early 1982. In his affidavit, O'Donnell states that these trades were for his own account and maintains that, under *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73, securities transactions for the personal account of the trader do not confer on the trader the status of a dealer in securities. We find this proposition to be too general and simplistic a statement of the law on this issue.

In *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73, plaintiff, a physician/investor, sought rescission of a securities purchase based on the seller's failure to file a 4G report of sale. The defendants in *Martin*, as Andeck here, argued that the sale was exempt from registration, and rescission could not lie because plaintiff was a "dealer" in securities. In support thereof, defendants pointed to the facts that plaintiff had characterized his business as that of "physician-investor" on his tax return, purchased almost $2 million in securities between April and July of one year, sold approximately $1½ million worth of securities during the same period, and borrowed over $2 million from nine banks to purchase securities. Defendants in *Martin* contended that based on the "intensity" of plaintiff's market activities, and "widely understood concepts of what constitutes engaging in business," plaintiff was a dealer. (25 Ill. App. 3d 238, 247, 323 N.E.2d 73, 80.) The *Martin* court rejected defendants' argument:

"[W]e judge that the protection afforded the investing public at large should not be diluted by denominating a private investor a 'dealer' whenever the magnitude and number of his purchases exceed a certain limit. *** In the present case, it is undisputed that all of plaintiff's security purchases, despite their volume and recurrence, were for his own account; *he shared none of the characteristics normally attributable to a dealer.* See II Loss, Securities Regulations, ch. 8B, at 1296-97 (2d ed. 1961)." (Emphasis added.) 25 Ill. App. 3d 238, 248, 323 N.E.2d 73, 81.

As is apparent from the *Martin* court's reasoning, the fact that the plaintiff had traded for his own account was only one of the considerations looked to in determining whether plaintiff was a dealer. The *Martin* court, citing *Loss*, concluded, based on a broader inquiry, that plaintiff "shared none of the characteristics" normally attributable to a dealer in securities. II Loss, Securities Regulations 1296-97 (2d ed. 1961).

Loss, in his section on "Broker-Dealer Registration," points out that the definition of a "dealer" under the SEA (15 U.S.C. sec. 78c(a)(5)) specifically exempts a person who deals in securities for his own account but not as part of a "regular business." (II Loss, Securities Regulations 1295 (2d ed. 1961).) Loss stresses that the phrase "business" connotes a certain regularity of participation in purchasing and selling activities rather than a few isolated transactions, but notes that a trader could be considered a broker or dealer by handling, *with regularity*, a single issue of securities. Loss makes clear that the distinction between a "dealer" and an investor or trader lies in the concept of "engaging in the business" of trading securities and not, as plaintiff O'Donnell contends, whether a trader has traded for his own account.

In attempting to draw a distinction between a private investor and a dealer, Loss sets forth the following characteristic attributes:

"[A dealer] ordinarily tries to obtain a regular clientele. He is apt to transact a substantial portion of his business directly with investors rather than with other dealers or through exchange members ***. A dealer ordinarily holds himself out as one engaged in buying and selling securities at a regular place of business. And his business *** is ordinarily characterized by a regular turnover, whereas a trader's transactions are generally more irregular in both volume and time. A trader, on the other hand, does not handle other people's money or securities; he does not "make a market"; and he does not furnish the services which are usually provided by dealers ***. Needless to say, a person

does not have to exhibit all or any given number of these dealer characteristics in order to be considered a dealer." II Loss, Securities Regulations 1297 (2d ed. 1961).

██ We feel the record before us does not contain sufficient facts to enable the court to determine whether plaintiff O'Donnell, based on his past securities transactions and activities, is a "dealer." As an alternative in the instant case, plaintiff O'Donnell requests that this court remand in part for further hearing on the facts regarding his investment intentions and business activities. In light of the paucity of facts bearing on these issues in the record, we find plaintiff's alternate request to be appropriate and so remand for further hearing.

## VI

### THE EXERCISE OF PERSONAL JURISDICTION OVER MCAFEE AND TAFT

The second issue raised by the instant appeal is the propriety of a court in Illinois exercising personal jurisdiction over McAfee, a nonresident defendant, under the authority of the Illinois long-arm statute. (Ill. Rev. Stat. 1981, ch. 110, par. 2—209.) Plaintiffs, in paragraph D of count I of their amended complaint, allege the following:

"D. McAfee and Taft prepared a Private Placement Memorandum for the Partnership, which it knew would be delivered, and which was delivered to residents of Illinois, including Plaintiffs and which was relied on by Plaintiffs in determining whether to invest in the Partnership. Further, as more fully set forth below, McAfee and Taft committed tortious conduct in Illinois by negligently failing to take steps to register the limited partnership units and file the necessary report of sale to procure a registration exemption."

Plaintiffs allege that, based on the act of preparing the private placement memorandum and on the omission to file the 4G report of sale, McAfee (1) transacted business within the State of Illinois, or (2) committed a tortious act within the State, thereby conferring long-arm jurisdiction. (Ill. Rev. Stat. 1981, ch. 110, pars. 2—209(a)(1), (2).) The trial court found that neither the act nor the omission to act justified the court's exertion of personal jurisdiction over the nonresident defendant. We agree.

██ Plaintiffs first contend that defendant McAfee's request for a 4G report of sale form from the office of the Illinois Secretary of State constituted the transaction of business in Illinois. While it is true, as plaintiff asserts, that a single act on the part of a defendant will suffice for jurisdiction, that act must: (1) give rise to the cause of action and (2) be one by which the defendant purposefully avails itself of the privi-

lege of conducting activities within the forum State and voluntarily invokes the benefits and protections of the State's laws. (*Empress International Ltd. v. Riverside Seafoods, Inc.* (1983), 112 Ill. App. 3d 149, 445 N.E.2d 371.) While the actual *filing* of a 4G report of sale might arguably be found to invoke the benefits and protections of the forum State's laws, it strains the interpretation of the "transaction of business" requirement to find that the mere request for a blank form similarly invokes such benefits and protections. We therefore find that personal jurisdiction under section 2—209(a)(1) of the long-arm statute does not lie. Ill. Rev. Stat. 1981, ch. 110, par. 2—209(a)(1).

■■ Plaintiffs next contend that personal jurisdiction over McAfee lies under section 2—209(a)(2) for the commission of a tortious act within the forum State. (Ill. Rev. Stat. 1981, ch. 110, par. 2—209(a)(2).) The tortious act complained of is McAfee's omission to file the 4G report of sale form. Plaintiffs premise this argument on a third-party beneficiary theory, claiming that because the filing of the 4G report of sale would primarily have been for the benefit of plaintiffs, the omission to file the report was a breach of duty owed to them as third-party beneficiaries. In support of this theory, plaintiffs cite *Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 440 N.E.2d 96, and *Ogle v. Fuiten* (1983), 112 Ill. App. 3d 048, 445 N.E.2d 1344. Our reading of these cases, as applied to the facts at bar, suggest that an essential element necessary to a recovery under a third-party beneficiary theory is absent in the present case.

In *Pelham*, third-party plaintiffs brought a negligence action against defendant attorney based on the attorney's failure to name plaintiffs as the prime beneficiaries in their father's life insurance policy. After recognizing that privity is not an essential prerequisite to establishing a duty of care between a nonclient and an attorney in a suit for legal malpractice, the *Pelham* court went on to find that no duty existed in that particular case based on the following reasoning:

> "While privity of contract has been abolished in many areas of tort law, the concern is still that liability for negligence not extend to an unlimited and unknown number of potential plaintiffs. In the area of legal malpractice the attorney's obligations to his client must remain paramount. In such cases the best approach is that the plaintiffs must allege and prove facts demonstrating that they are in the nature of third-party intended beneficiaries of the relationship between the client and the attorney in order to recover in tort. [Citations omitted]. By this we mean that to establish a duty owed by the defendant attorney to the nonclient the nonclient must allege and prove that the intent of the client

to benefit the nonclient third party was the primary or direct purpose of the transaction or relationship." (92 Ill. 2d 13, 20-21, 440 N.E.2d 96, 99.)

The *Pelham* court concluded that, for a nonclient to succeed in a negli- gence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party. (92 Ill. 2d 13, 21, 440 N.E.2d 96, 100.) This conclusion was more recently affirmed in *Ogle v. Fuiten* (1983), 112 Ill. App. 3d 1048, 445 N.E.2d 1344, wherein the appellate court held that to state a cause of action by a nonclient for attorney negligence, a plaintiff must plead and prove that the relationship between the attorney and his client was *entered into* for the primary and direct benefit of the plaintiff.

In the instant case, plaintiffs alleged in their complaint that because the Illinois Securities Act of 1953 is "intended to protect and benefit prospective investors in securities, the contract thus had the primary purpose of benefitting and protecting the class of investors of which Plaintiffs were members." While a liberal construction of these allegations might arguably meet the pleading criteria set forth in·*Pelham*, here, upon reconsideration, a supplemental affidavit was filed. Plaintiffs filed no counteraffidavits. The trial court reversed its initial ruling on defendant's motion to dismiss based on the supplemental affidavit of Brice E. Tarzwell, which contained the following statements of uncontradicted fact:

"4. At the time of the formation of the oral contract between McAfee & Taft *** and Andeck *** there was no mention of the plaintiffs and no discussion that the oral contract was entered into for the purpose of benefitting the plaintiffs or any other prospective purchaser.

5. At the time of the formation of the oral contract *** there was no discussion about whether the firm was to render services for the purpose of complying with the securities law of the State of Illinois. The only discussion at that time related to sales in the State of California."

Where well-alleged facts within an affidavit are not contradicted by counteraffidavit, they must be taken as true notwithstanding the existence of contrary averments in the adverse party's pleadings. (*Kutner v. DeMassa* (1981), 96 Ill. App. 3d 243, 421 N.E.2d 231.) If a defendant's affidavit contesting jurisdiction is not refuted by a counteraffidavit filed by the plaintiff, the facts alleged in the defendant's affidavit are accepted as true. *Doolin v. K-S Telegage Co.* (1979), 75 Ill. App. 3d 25, 393 N.E.2d 556.

Here, defendant's affidavit specifically states that plaintiffs were not the intended beneficiaries of the contract between Andeck and McAfee. Plaintiffs filed no counteraffidavit. Moreover, it is arguable that the allegations of the complaint were in and of themselves insufficient to state a cause of action under a third-party beneficiary theory of recovery. Correspondingly, plaintiff's reliance on *Florendo v. Pan Hemisphere Transport, Inc.* (N.D. Ill. 1976), 419 F. Supp. 16, which addresses a breach of duty for failure to register the sale of a security, is misplaced because *Florendo* does not deal with a third-party beneficiary theory of recovery. In *Florendo*, the issue was whether the sellers themselves had breached a duty to the buyers. Here, the issue is whether the attorneys for the sellers have breached a duty to the buyers. In consideration of the foregoing, we find that the trial court's order of June 8, 1984, dismissing counts I and II of the complaint against McAfee for lack of personal jurisdiction, was proper.

## VII

In summary, our findings in the instant case are as follows: (1) the legislature has manifested its intent that financial futures contracts be regulated and viewed as commodities rather than securities; for this reason (2) the trial court is, under the preemption doctrine, precluded from finding that financial futures contracts are "securities," and (3) plaintiffs Conroy, Burrell, and Gorman are not "dealers" in securities so as to deny them the statutory remedy of rescission against defendant Andeck; we therefore reverse the trial court's decision as to plaintiffs Conroy, Burrell, and Gorman and reinstate count I for rescission as to these plaintiffs; (4) because the record contains insufficient evidence to determine whether plaintiff O'Donnell engages in the business of securities trading or dealing, we reverse and remand for further hearing on this issue; (5) we affirm the trial court's decision finding lack of personal jurisdiction over and dismissing counts I and II against defendant McAfee, and finally (6) we remand the entire cause for a continuation of the proceedings below.

Affirmed in part, reversed in part, and remanded for further proceedings.

JIGANTI, P.J., and JOHNSON, J., concur.