Warren **MOSLER**, Plaintiff–Appellee,

v.

**S/P ENTERPRISES, INC., Peter B. Carey, and Roger Pfohl, Defendants–Appellants.**

No. 88–3458.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1989.

Decided Oct. 30, 1989.

Rehearing and Rehearing En Banc Denied Dec. 7, 1989.

David K. Schmitt, Lee A. Watson, Laurence H. Lenz, Jr., Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for plaintiff-appellee.

Richard J. Prendergast, James Prendergast, Joseph E. Tighe, Franklin J. Lunding, Jr., Charles M. Biggam, Jr., Biggam, Cowan, Marquardt & Lunding, Chicago, Ill., for defendants-appellants.

Before BAUER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Warren Mosler, a professional securities trader and experienced investor, purchased interests in some Ohio oil and gas properties. Michael Krebsar, Michael McKenzie, and Ralph Santilli, as M/K Ventures International, Inc., operated and promoted these properties. Krebsar recruited Peter B. Carey (a partner of a Chicago law firm) and Roger Pfohl to round up investors in Illinois. Neither Carey nor Pfohl had special knowledge about oil and gas in Ohio—or anywhere else, for that matter. Carey and Pfohl formed S/P Enterprises, Inc., through which they sold interests in M/K Ventures' projects. These interests are "securities". Mosler wants to rescind the transactions and retrieve the $500,000 he paid.

Under Illinois law offerings of securities must be registered. Distributions to fewer than 35 persons need not be registered, but the state requires the "issuer, controlling person, or dealer" to file a report with its Secretary of State no later than 30 days after the sale. Ill.Rev.Stat. ch. 121½ ¶ 137.4 H (1981). No one filed such a report of the sales to Mosler. Carey and Pfohl, alerted to the need for a report, took the position that M/K had to file; M/K did not file; Carey and Pfohl did not protect themselves by filing in its stead.

The Ohio ventures did not pay off, and Mosler demanded rescission of the sales, an obligation that fell on Carey and Pfohl under state law. Unless Mosler was a "dealer" in securities (a question to which we return), he was entitled to rescission under the law as it stood in late 1983, when the transactions took place. Carey and Pfohl maintain that subsequent changes in Illinois law defeat Mosler's demand. Before his retirement, Judge Leighton rejected this contention and entered partial summary judgment for Mosler. 1987 WL 9309, 1987 U.S. Dist. LEXIS 2756 (N.D.Ill.), reconsideration denied, 1987 WL 14014, 1987 U.S. Dist. LEXIS 6477 (1987). After Judge Leinenweber wrapped up the case by resolving other claims and the status of other parties, Carey, Pfohl, and S/P Enterprises (the "S/P parties") pursued this appeal. The other claims and parties have dropped out; only Mosler's demand for rescission is before us.

Illinois has amended ¶ 137.4 twice in recent years. The first, enacted in July 1983 (before the sales) but effective on January 1, 1984, replaced subsections 4 G and 4 H with a new subsection 4 G that specified in greater detail the essential elements of ex-

empt transactions. Subsection 4 G(4) provided that:

> The Secretary of State shall by rule or regulation require and prescribe the form of a report to be filed upon the conclusion of all sales made in reliance upon the exemption provided by this subsection G and every six months after the first such sale unless the report due upon the conclusion of all sales has been filed, but the failure to file any such report shall not affect the availability of such exemption.

The principal drafters of this language explained in a contemporaneous commentary that the small-issue exemption had been designed to allow small firms to raise capital "in an informal manner without benefit of counsel" and that the filing requirement had been "a classic trap for the unwary" with "harsh and inequitable consequences". Roger G. Fein & Sidney Sosin, Interpretive Comments published with the statute in Ill.Ann.Stat. ch. 121½ (West 1983).

As amended in 1983, section 4 G(4) could be read to say that despite any regulations the Secretary of State might promulgate, the issuer and seller never had to file a report. The report "shall not affect the availability of such exemption", so why bother? The drafters wanted to make the report compulsory but eliminate the "harsh and inequitable" remedy of rescission. So in 1985 the state legislature revised the statute again, with the changes to go into effect on January 1, 1986. Section 4 G was rewritten to make it clear that the issuer had to file the report prescribed by the Secretary of State. New language in the remedial provisions of the statute specified:

> ... Any provision ... to the contrary notwithstanding, the civil remedies provided in this subsection A [including rescission] shall not be available against any person by reason of the failure to file with the Secretary of State, or on account of the content of, any report of sale provided for in subsection G or P of Section 4 of this Act.

Ill.Rev.Stat. ch. 121½ ¶ 137.13 A (1987).

After the first of these two amendments went into force, defendants in pending cases argued that they should not be exposed to rescission. They regularly lost. E.g., *Thoms v. Private Ledger Financial Services, Inc.*, 155 Ill.App.3d 289, 107 Ill. Dec. 958, 507 N.E.2d 1327 (2d Dist.1987); *Salzbrenner v. Beckham*, 145 Ill.App.3d 941, 99 Ill.Dec. 779, 496 N.E.2d 354 (2d Dist.1986); *Boldon v. Chiappa*, 140 Ill. App.3d 913, 95 Ill.Dec. 54, 489 N.E.2d 6 (4th Dist.1986). All of the opinions concluded that state law presumptively applies prospectively, see *Maiter v. Chicago Board of Education*, 82 Ill.2d 373, 390, 47 Ill.Dec. 721, 728–29, 415 N.E.2d 1034, 1041–42 (1980), and that the legislature had not provided for retrospective application of the changes at hand. Indeed, by setting the effective date of the 1983 act as January 1, 1984, the legislature had done its best to make the change run prospectively.

Although these decisions were rendered after the enactment and effectiveness of the 1985 statute, none mentions it. This is defendants' opening. The S/P parties maintain that the 1983 statute was prospective because it worked a "substantive" change in the rules. The 1985 law, by contrast, revoked a remedy, and this, defendants say with some support, makes all the difference. See *Stefani v. Baird & Warner, Inc.*, 157 Ill.App.3d 167, 109 Ill. Dec. 444, 510 N.E.2d 65 (1st Dist.1987). Rights and remedies are closely related, and we are reluctant to attribute to Illinois a dividing line as sharp as Carey and Pfohl find in *Stefani*. The 1983 and 1985 amendments were aimed at the same problem: rescission as an excessive remedy for failure to file a report. The two statutes show that alteration of rights (1983) and remedies (1985) may be used to achieve the same end. The 1985 change was not an extension of the 1983 change; it came about because the 1983 language may have gone too far (implying that the issuer needn't file a report at all), and the legislature then used more careful language to achieve its objective. *Schuler v. Beers*, 157 Ill.App.3d 97, 105, 109 Ill.Dec. 427, 431, 510 N.E.2d 48, 52 (1st Dist.1987).

To attribute a dramatically different effect to the statutes according to the device

the legislature used is to make the outcome fortuitous. So we are not surprised to find many Illinois cases denying that there is a sharp line between changes in rights (prospective only) and remedies (retroactive always). Courts regularly say that the effects of the law depend in either case on what the legislature sought to achieve. *Moore v. Jackson Park Hospital,* 95 Ill.2d 223, 235, 69 Ill.Dec. 191, 196, 447 N.E.2d 408, 413 (1983), quoting *People ex rel. Manczak v. Carpentier,* 3 Ill.2d 556, 558–59, 121 N.E.2d 762, 763 (1954). *Salzbrenner,* which denied retroactive effect to the 1983 amendment, is among those making the point. The defendants in *Salzbrenner* contended that the change in 1983 was to all purposes the expunction of a remedy, and therefore retroactive. The court replied:

> Even assuming the amendments [of 1983] relate to a purely remedial provision and that plaintiffs had no vested right to the remedy of rescission, this alone does not mandate that the amendments be applied retroactively without regard to the intention of the legislature. Whether a particular enactment operates retroactively or prospectively ultimately is determined on the basis of legislative intent. This is true even where the legislation is said to relate to a remedial or procedural provision.

*Salzbrenner,* 99 Ill.Dec. at 782, 496 N.E.2d at 357 (citations omitted). The court concluded that the 1983 changes apply prospectively, even if "remedial", because they took effect six months after being enacted. That is no less true of the 1985 changes. See also *Potter v. Judge,* 112 Ill.App.3d 81, 89, 67 Ill.Dec. 585, 590, 444 N.E.2d 821, 826 (3d Dist.1983) (four-month deferral implies prospective application).

■ No one has suggested why Illinois would allow rescission to occur in 1984 and 1985—despite the decision in 1983 to get rid of that remedy in failure-to-file cases—only to stamp it out in 1986 for pre–1984 sales. No one has suggested why Illinois would defer the effect of the 1985 changes for six months only to make them retroactive as soon as they went into force—so that rescission would be available in cases

dealing with pre–1984 sales that reached final judgment between July and December 1985, but that at the stroke of midnight on New Year's Day 1986 everyone else with pending litigation would lose. The S/P parties attribute the deferral to the state's constitution plus inadvertence. Illinois allows its legislature to set a date on which statutes take effect, in default of provision in the particular law, Illinois Constitution Art. 4 § 10. The legislature exercised this power by providing that statutes take effect on the January 1 following their enactment, unless they specify a different time. Ill.Rev.Stat. ch. 1 ¶ 1201. If inattentiveness (as opposed to a belief that the standby rule of deferral was appropriate) "explains" the delay for the 1985 legislation, the same "explanation" applies to the 1983 law—yet *Salzbrenner* took the delay in 1983 as proof positive that the change was to be prospective. We have no reason to think that the Supreme Court of Illinois would disagree with either the method or the holding of *Salzbrenner,* and we therefore conclude that the 1985 amendment, too, applies prospectively.

■ Although the offering should have been registered, not all purchasers were eligible for rescission even under the law in force before 1984. Dealers, in particular, could not rescind a transaction on the grounds Mosler presents. State law defines dealer this way:

> "Dealer" means any person, other than a salesperson, ... who engages in this State, either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, selling, buying and selling, or otherwise dealing or trading in securities issues by another person.

Ill.Rev.Stat. ch. 121½ ¶ 137.2–7 (1981). Judge Leighton concluded that Mosler was not a dealer in 1983.

Mosler is a substantial, sophisticated investor, engaged in the securities business full time since 1976, when Bache Securities hired him. But was he in the "business of dealing or trading" in the sense this statute employs? Cf. *Conroy v. Andeck Re-*

*sources '81 Year–End, Ltd.,* 137 Ill.App.3d 375, 92 Ill.Dec. 10, 484 N.E.2d 525 (1st Dist.1985). Mosler moved to Chicago in 1978 to take up employment with William Blair & Co. Although Blair was registered under state law as a "dealer", Mosler, who spent his time buying and selling tax-exempt government securities for Blair's account, was registered as a "salesperson" under a distinct provision of state law. Contrast Ill.Rev.Stat. ch. 121½ ¶ 137.2–9 with ¶ 137.2–10. Blair was a principal in these transactions; Mosler was Blair's agent. A salesperson is "an individual, other than an issuer or a dealer, employed or appointed or authorized by a dealer, issuer or controlling person to offer, purchase or sell securities in this State." ¶ 137.2–9. In any system distinguishing between salespersons and dealers—as both state and federal systems do—Mosler was on the salesperson side of the line.

Defendants say that inferences and material facts are disputed because Mosler's trades for Blair were so large (perhaps a billion dollars principal amount in a year, turning the portfolio over rapidly), and his income so large (gross income of $2.7 million in 1983) that he must be deemed a professional trader. Defendants add that Mosler acted as the general partner and trader in an investment partnership formed with some of his friends. All of this may be granted without making Mosler a "dealer" under Illinois law. By distinguishing dealer from salesperson, the statute specifies that not all professional traders are "dealers". *Conroy,* 137 Ill.App.3d at 387, 92 Ill.Dec. at 20, 484 N.E.2d at 535; *Martin v. Orvis Brothers & Co.,* 25 Ill.App.3d 238, 241–42, 247–49, 323 N.E.2d 73, 76, 81 (1st Dist.1974).

In the trade, a "dealer" is one who buys and sells to customers from his own portfolio or who participates in the initial distribution of stock as a principal (sometimes as agent for the underwriter or issuer). See Louis Loss & Joel Seligman, 2 *Securities Regulation* 1134–35 (3d ed.1989). Mosler did not hold a portfolio of stock, offering to buy or sell at market prices; he did not take part in the initial distribution of securities. He did not even match or execute

customers' orders, the common function of a "broker". Mosler evaluated stock and placed orders for a principal (Blair). When he traded for his own (and his friends') account, he proceeded as any customer does in the market. The partnership, according to undisputed affidavits, bought and held securities; Mosler did not turn over the assets in the way a dealer holds a "retail" portfolio for sale. Big customers are not "dealers" just because of size and sophistication. Since filing this case Mosler has quit Blair and gone into the business as a principal, registering as a dealer. Unless the tryout in New Haven is the same thing as the opening on Broadway, however, Mosler was not a dealer in 1983.

■ Our final inquiry is whether Judge Leinenweber erred when directing defendants to satisfy the judgment before Mosler tenders his interests, and by holding that Mosler need not tender to Carey and Pfohl the judgment rights obtained against the M/K defendants. The version of § 13 of the Illinois Securities Law in force in 1983 stated:

> Every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser …; and upon tender to the seller or into court of the securities sold … [the persons obliged to make rescission shall] be jointly and severally liable to such purchaser for (1) the full amount paid, together with interest from the date of payment for the securities sold … less any income or other amounts received by such purchaser on such securities and (2) the reasonable fees of such purchaser's attorney incurred in any action brought for recovery of the amounts recoverable hereunder.

Ill.Rev.Stat. ch. 121½ ¶ 137.13 (1981). The person seeking rescission must tender "the securities sold" and is entitled to the purchase price, plus interest, less "any income or other amounts received … on such securities". Although this establishes two rules, one dealing with tender and the other with the amount to be paid on tender, the parties treated the credit requirement in the district court as a form of tender

rule when the amount to be credited has not been liquidated, and Mosler's half-hearted effort to do otherwise on appeal is too little, too late. (Mosler's brief flags the point without arguing it.)

Section 13 says that restitution is due "upon tender of the securities". The district court's judgment, by contrast, provides that "[u]pon payment to him by the S/P defendants of [the amount due as restitution], Mosler shall assign to the S/P defendants his interests ... in a manner satisfactory to the S/P defendants". It is impossible to reconcile the judgment, requiring tender upon payment, with the statute, requiring payment upon tender.

Carey and Pfohl are entitled to know, before they pay, that they will receive any future income attributable to Mosler's partnership interests and that the assignment will indeed be "satisfactory" to them; the last thing they want is to pay more than $650,000 (the amount due, with interest) only to have Mosler attempt to retain future income from the oil and gas projects. If Carey and Pfohl were the issuers, it would be simple to enter a judgment cancelling Mosler's interest. Cf. *Restatement of Restitution* § 65 comment b at 256–57 (1937); George E. Palmer, 1 *The Law of Restitution* § 3.11 (1978). They aren't, so it is best to carry out the statutory program precisely. Each side can protect its interests by tendering into the registry of the court, which can complete the exchange when each side is satisfied with the other's performance.

■ The S/P parties want not only Mosler's partnership interests but also the judgment rights Mosler obtained against M/K Ventures and its principals. These parties defaulted in Mosler's action against them, and Mosler obtained two kinds of awards: damages for fraud (and breach of fiduciary duty) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68. The fraud award is based on the purchase price of the securities (less income received), and the RICO award is treble that. Mosler has not collected on the judgment, which was entered in 1985. If Mos-

ler were to collect anything after receiving restitution from the S/P parties, he would have to remit the proceeds to them (at least to the point of single damages). Pursuing a deadbeat for the benefit of a stranger is noble but not common; likely Mosler will give up on the M/K defendants once Carey and Pfohl pay. The S/P parties want to reduce their net obligations by pursuing Krebsar and his henchmen to the ends of the earth, and to facilitate this they want Mosler to tender his judgment against them.

No Illinois case addresses such a problem, and neither does any case we could find under parallel provisions in the Securities Act of 1933 and the laws of other states. We must decide how the Supreme Court of Illinois would answer a question it has not faced. One potential answer is that Carey and Pfohl are not entitled to Mosler's rights against the M/K defendants but must instead bring an independent action for indemnity. Yet this seems a pointless step, because indemnity (more precisely, subrogation) is assured. Under § 13 persons required to make restitution are entitled to credit for "any income or other amounts received" on the security. If the partnerships, or the M/K defendants, had given Mosler $100,000 in distributions, or refunded $100,000 of the purchase price, Carey and Pfohl would get an automatic credit of this amount. Mosler's fraud judgment against the M/K defendants is a substitute for distributions and repayment; that it has yet to be liquidated (and may never be) does not change the nature of the equation in restitution: the purchase price *less* anything received on the investment. The fraud award, standing in the stead of distributions, is a cousin to actual payments and should be handed over so that the S/P parties are assured of credit for all sums that can be collected from the M/K parties.

The treble damages judgment under RICO is a different beast. Trebling is not a return of capital or a substitute for distributions. Because frauds are concealable, trebling is important to produce proper incentives. *Carter v. Berger*, 777 F.2d 1173,

1176 (7th Cir.1985). If perpetrators pay what they took when they get caught, and keep the proceeds the rest of the time, then fraud is profitable. If victims recoup only what they lost, and face the burdens and uncertainties of the legal process plus the costs of their own counsel, then victory will not make them whole, and the shortfall may mean that victims will not vigorously investigate and litigate. Trebling addresses both halves of this equation.

If victims must assign their right to treble damages in order to obtain restitution, RICO will be less effective in inducing victims to pursue wrongdoers—and anything that makes victims less aggressive in investigating and litigating makes fraud more profitable to its perpetrators. If the victim must assign the recovery to obtain restitution, it could obtain treble damages only by foreswearing restitution, which would reduce the anticipated recovery (by removing the chance to collect from some solvent defendants) and so reduce the incentive to pursue wrongdoers. Although this is unimportant when the persons liable under RICO are either judgment-proof or certain to pay the full award—in the former case losing the opportunity to collect from them is irrelevant and in the latter case the plaintiff will tap them for the whole award—the difference may be substantial when the RICO defendant can pay some but not all of the judgment. Suppose the issuer of the securities (the fraud-feasor) can pay twice the amount of the investment while the seller has assets sufficient to return the investment. If the victim keeps the RICO award, he receives treble damages: restitution from the seller, and double damages (the punitive component) from the issuer. If the victim must assign the RICO judgment to the seller as a prerequisite to restitution, he will abjure that remedy and collect double damages from the issuer, less than his entitlement under RICO. Were the victim to assign the RICO award, he would end up with single damages (restitution by the seller), while the seller of the securities would get a windfall by collecting double damages from the issuer. Suppose, instead, that the issuer and seller each can pay a sum equal to the purchase price. If the victim keeps both awards, he can collect double damages; assignment as a condition of restitution would mean collecting single damages from the issuer and ignoring the seller, or collecting restitution from the seller (who would then recoup from the issuer). Again the goal of RICO would be defeated.

Mosler does not argue that RICO preempts any state law that would require him to assign his judgment interests as a condition of restitution. He does argue, however, that the RICO award is not "income or other amounts received by such purchaser on such securities" within the meaning of § 13 of the state's securities law. RICO establishes treble-damages liability independent of the securities and of state law. We therefore think that the Supreme Court of Illinois would hold that a treble-damages judgment under RICO is not an "amount[ ] received by [the] purchaser *on* such securities" (emphasis added), even though the sale is a but-for cause of the recovery under RICO.

All of this may be a tempest in a teapot. Mosler has recovered nothing from the M/K defendants; the S/P parties have not explained why they think they will be able to wring even single damages from these elusive fellows. A footnote in Mosler's brief says that "Mosler, for what it is worth, has offered to assign his judgment against the M/K defendants to the S/P defendants ... once he is made whole." So the only dispute may be whether Mosler must tender an instrument of assignment into court while waiting for payment. Judgments don't languish in captivity, and tender would not prevent Mosler from pursuing the M/K defendants if the S/P defendants drag their heels in paying.

The judgment is affirmed, and the case is remanded with directions to make Mosler's tender of his partnership interests and judgment rights (other than those based on RICO) against the M/K defendants conditions precedent to restitution. No costs in this court.