GREYCAS, INC., Plaintiff-Appellee,

v.

Theodore S. PROUD,
Defendant-Appellant.

No. 86–2340.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 17, 1987.

Decided Aug. 3, 1987.

Rehearing Denied Aug. 17, 1987.

Nancy G. Lischer, Hinshaw, Culbertson Moelmann, Hoban & Fuller, Chicago, Ill., for defendant-appellant.

Robert G. Heckenkamp, Heckenkamp, Simahauser & Drake, P.C., Springfield, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Theodore S. Proud, Jr., a member of the Illinois bar who practices law in a suburb of Chicago, appeals from a judgment against him for $833,760, entered after a bench trial. The tale of malpractice and misrepresentation that led to the judgment begins with Proud's brother-in-law, Wayne Crawford, like Proud a lawyer but one who devoted most of his attention to a large farm that he owned in downstate Illinois. The farm fell on hard times and by 1981 Crawford was in dire financial straits.. He had pledged most of his farm machinery to lenders, yet now desperately needed more money. He approached Greycas, Inc., the plaintiff in this case, a large financial company headquartered in Arizona, seeking a large loan that he offered to secure with the farm machinery. He did not tell Greycas about his financial difficulties or that he had pledged the machinery to other lenders, but he did make clear that he needed the loan in a hurry. Greycas obtained several appraisals of Crawford's farm machinery but did not investigate Crawford's financial position or discover that he had pledged the collateral to other lenders, who had perfected their liens in the collateral. Greycas agreed to lend Crawford $1,367,966.50, which was less than the appraised value of the machinery.

The loan was subject, however, to an important condition, which is at the heart

of this case: Crawford was required to submit a letter to Greycas, from counsel whom he would retain, assuring Greycas that there were no prior liens on the machinery that was to secure the loan. Crawford asked Proud to prepare the letter, and he did so, and mailed it to Greycas, and within 20 days of the first contact between Crawford and Greycas the loan closed and the money was disbursed. A year later Crawford defaulted on the loan; shortly afterward he committed suicide. Greycas then learned that most of the farm machinery that Crawford had pledged to it had previously been pledged to other lenders.

The machinery was sold at auction. The Illinois state court that determined the creditors' priorities in the proceeds of the sale held that Greycas did not have a first priority on most of the machinery that secured its loan; as a result Greycas has been able to recover only a small part of the loan. The judgment it obtained in the present suit is the district judge's estimate of the value that it would have realized on its collateral had there been no prior liens, as Proud represented in his letter.

That letter is the centerpiece of the litigation. Typed on the stationery of Proud's firm and addressed to Greycas, it identifies Proud as Crawford's lawyer and states that, "in such capacity, I have been asked to render my opinion in connection with" the proposed loan to Crawford. It also states that "this opinion is being delivered in accordance with the requirements of the Loan Agreement" and that

> I have conducted a U.C.C., tax, and judgment search with respect to the Company [i.e., Crawford's farm] as of March 19, 1981, and except as hereinafter noted all units listed on the attached Exhibit A ("Equipment") are free and clear of all liens or encumbrances other than Lender's perfected security interest therein which was recorded March 19, 1981 at the Office of the Recorder of Deeds of Fayette County, Illinois.

The reference to the lender's security interest is to Greycas's interest; Crawford, pursuant to the loan agreement, had filed a notice of that interest with the recorder.

The excepted units to which the letter refers are four vehicles. Exhibit A is a long list of farm machinery—the collateral that Greycas thought it was getting to secure the loan, free of any other liens. Attached to the loan agreement itself, however, as Exhibit B, is another list of farm machinery constituting the collateral for the loan, and there are discrepancies between the two lists; more on this later.

Proud never conducted a search for prior liens on the machinery listed in Exhibit A. His brother-in-law gave him the list and told him there were no liens other than the one that Crawford had just filed for Greycas. Proud made no effort to verify Crawford's statement. The theory of the complaint is that Proud was negligent in representing that there were no prior liens, merely on his brother-in-law's say-so. No doubt Proud *was* negligent in failing to conduct a search, but we are not clear why the *misrepresentation* is alleged to be negligent rather than deliberate and hence fraudulent, in which event Greycas's alleged contributory negligence would not be an issue (as it is, we shall see), since there is no defense of contributory or comparative negligence to a deliberate tort, such as fraud. See, e.g., *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir.1982) (Illinois law); cf. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528–29 (7th Cir.1985). Proud did not merely say, "There are no liens"; he said, "I have conducted a U.C.C., tax, and judgment search"; and not only is this statement, too, a false one, but its falsehood cannot have been inadvertent, for Proud knew he had not conducted such a search. The concealment of his relationship with Crawford might also support a charge of fraud. But Greycas decided, for whatever reason, to argue negligent misrepresentation rather than fraud. It may have feared that Proud's insurance policy for professional malpractice excluded deliberate wrongdoing from its coverage, or may not have wanted to bear the higher burden of proving fraud, or may have feared that an accusation of fraud would make it harder to settle the case—for most cases, of course, are settled, though this one has not

been. In any event, Proud does not argue that either he is liable for fraud or he is liable for nothing.

He also does not, and could not, deny or justify the misrepresentation; but he argues that it is not actionable under the tort law of Illinois, because he had no duty of care to Greycas. (This is a diversity case and the parties agree that Illinois tort law governs the substantive issues.) He argues that Greycas had an adversarial relationship with Proud's client, Crawford, and that a lawyer has no duty of straight dealing to an adversary, at least none enforceable by a tort suit. In so arguing, Proud is characterizing Greycas's suit as one for professional malpractice rather than negligent misrepresentation, yet elsewhere in his briefs he insists that the suit was solely for negligent misrepresentation—while Greycas insists that its suit charges both torts. Legal malpractice based on a false representation, and negligent misrepresentation by a lawyer, are such similar legal concepts, however, that we have great difficulty both in holding them apart in our minds and in understanding why the parties are quarreling over the exact characterization; no one suggests, for example, that the statute of limitations might have run on one but not the other tort. So we shall discuss both.

■ Proud is undoubtedly correct in arguing that a lawyer has no general duty of care toward his adversary's client; it would be a considerable and, as it seems to us, an undesirable novelty to hold that every bit of sharp dealing by a lawyer gives rise to prima facie tort liability to the opposing party in the lawsuit or negotiation. The tort of malpractice normally refers to a lawyer's careless or otherwise wrongful conduct toward his own client. Proud argues that Crawford rather than Greycas was his client, and although this is not so clear as Proud supposes—another characterization of the transaction is that Crawford undertook to obtain a lawyer for Greycas in the loan transaction—we shall assume for purposes of discussion that Greycas was not Proud's client.

Therefore if malpractice just meant carelessness or other misconduct toward one's own client, Proud would not be liable for malpractice to Greycas. But in *Pelham v. Griesheimer*, 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982), the Supreme Court of Illinois discarded the old common law requirement of privity of contract for professional malpractice; so now it is possible for someone who is not the lawyer's (or other professional's) client to sue him for malpractice. The court in *Pelham* was worried, though, about the possibility of a lawyer's being held liable "to an unlimited and unknown number of potential plaintiffs," *id.* at 20, 64 Ill.Dec. at 547, 440 N.E.2d at 99, so it added that "for a nonclient to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party," *id.* at 21, 64 Ill.Dec. at 548, 440 N.E.2d at 100. That, however, describes this case exactly. Crawford hired Proud not only for the primary purpose, but for the sole purpose, of influencing Greycas to make Crawford a loan. The case is much like *Brumley v. Touche, Ross & Co.*, 139 Ill.App.3d 831, 836, 93 Ill.Dec. 816, 819–20, 487 N.E.2d 641, 644–45 (1985), where a complaint that an accounting firm had negligently prepared an audit report that the firm knew would be shown to an investor in the audited corporation and relied on by that investor was held to state a claim for professional malpractice. In *Conroy v. Andeck Resources '81 Year-End Ltd.*, 137 Ill.App.3d 375, 389–91, 92 Ill.Dec. 10, 21–22, 484 N.E.2d 525, 536–37 (1985), in contrast, a law firm that represented an offeror of securities was held not to have any duty of care to investors. The representation was not intended for the benefit of investors. Their reliance on the law firm's using due care in the services it provided in connection with the offer was not invited. Cf. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir.1986).

All this assumes that *Pelham* governs this case, but arguably it does not, for Greycas, as we noted, may have decided to bring this as a suit for negligent misrepre-

sentation rather than professional malpractice. We know of no obstacle to such an election; nothing is more common in American jurisprudence than overlapping torts.

The claim of negligent misrepresentation might seem utterly straightforward. It might seem that by addressing a letter to Greycas intended (as Proud's counsel admitted at argument) to induce reliance on the statements in it, Proud made himself prima facie liable for any material misrepresentations, careless or deliberate, in the letter, whether or not Proud was Crawford's lawyer or for that matter anyone's lawyer. Knowing that Greycas was relying on him to determine whether the collateral for the loan was encumbered and to advise Greycas of the results of his determination, Proud negligently misrepresented the situation, to Greycas's detriment. But merely labeling a suit as one for negligent misrepresentation rather than professional malpractice will not make the problem of indefinite and perhaps excessive liability, which induced the court in *Pelham* to place limitations on the duty of care, go away. So one is not surprised to find that courts have placed similar limitations on suits for negligent misrepresentation—so similar that we are led to question whether, as suggested in *HGN Corp. v. Chamberlain, Hrdlicka, White, Johnson & Williams,* 642 F.Supp. 1443, 1452–53 (N.D. Ill.1986), these really are different torts, at least when both grow out of negligent misrepresentations by lawyers. For example, the *Brumley* case, which we cited earlier, is a professional-malpractice case, yet it has essentially the same facts as *Ultramares Corp. v. Touche, Niven & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931), where the New York Court of Appeals, in a famous opinion by Judge Cardozo, held that an accountant's negligent misrepresentation was not actionable at the suit of a lender who had relied on the accountant's certified audit of the borrower.

The absence of a contract between the lender and the accountant defeated the suit in *Ultramares*—yet why should privity of contract have been required for liability just because the negligence lay in disseminating information rather than in designing or manufacturing a product? The privity limitation in products cases had been rejected, in another famous Cardozo opinion, years earlier. See *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916). Professor Bishop suggests that courts were worried that imposing heavy liabilities on producers of information might cause socially valuable information to be underproduced. See *Negligent Misrepresentation Through Economists' Eyes,* 96 L.Q.Rev. 360 (1980). Many producers of information have difficulty appropriating its benefits to society. The property-rights system in information is incomplete; someone who comes up with a new idea that the law of intellectual property does not protect cannot prevent others from using the idea without reimbursing his costs of invention or discovery. So the law must be careful not to weigh these producers down too heavily with tort liabilities. For example, information produced by securities analysts, the news media, academicians, and so forth is socially valuable, but as its producers can't capture the full value of the information in their fees and other remuneration the information may be underproduced. Maybe it is right, therefore—or at least efficient—that none of these producers should have to bear the full costs. (Similar reasoning may explain the tort immunity, now largely abrogated, of charitable enterprises, and the tort immunities of public officers. See *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987); *Carson v. Block,* 790 F.2d 562, 564 (7th Cir.1986).) At least that was once the view; and while *Ultramares* has now been rejected, in Illinois as elsewhere—maybe because providers of information are deemed more robust today than they once were or maybe because it is now believed that auditors, surveyors, and other providers of professional services were always able to capture the social value of even the information component of those services in the fees they charged their clients—a residuum of concern remains. So when in *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656 (1969), the Supreme Court of Illinois, joining the march away from *Ultramares,* held

for the first time that negligent misrepresentation was actionable despite the absence of a contract, and thus cast aside the same "privity of contract" limitation later overruled with regard to professional malpractice in *Pelham*, the court was careful to emphasize facts in the particular case before it that limited the scope of its holding—facts such as that the defendant, a surveyor, had placed his "absolute guarantee for accuracy" on the plat and that only a few persons would receive and rely on it, thus limiting the potential scope of liability. See *id.* at 67–68, 250 N.E.2d at 663.

Later Illinois cases, however, influenced by section 552 of the Second Restatement of Torts (1977), state the limitation on liability for negligent misrepresentation in more compact terms—as well as in narrower scope—than *Rozny*. These are cases in the intermediate appellate court, but, as we have no reason to think the Supreme Court of Illinois would reject them, we are bound to follow them. See *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern National Ins. Group*, 750 F.2d 619, 624 (7th Cir.1984). They hold that "one who in the course of his business or profession supplies information for the guidance of others in their business transactions" is liable for negligent misrepresentations that induce detrimental reliance. *Penrod v. Merrill Lynch, Pierce, Fenner & Smith*, 68 Ill.App.3d 75, 81–82, 24 Ill.Dec. 464, 469, 385 N.E.2d 376, 381 (1979); see also *Perschhall v. Raney*, 137 Ill.App.3d 978, 983, 92 Ill.Dec. 431, 434, 484 N.E.2d 1286, 1289 (1985); Prosser and Keeton on the Law of Torts § 107, at p. 747 (5th ed. 1984). Whether there is a practical as distinct from a merely semantic difference between this formulation of the duty limitation and that of *Pelham* may be doubted but cannot change the outcome of this case. Proud, in the practice of his profession, supplied information (or rather misinformation) to Greycas that was intended to guide Greycas in commercial dealings with Crawford. Proud therefore had a duty to use due care to see that the information was correct. He used no care.

Proud must lose on the issue of liability even if the narrower, *ad hoc* approach of *Rozny* is used instead of the approach of section 552 of the Restatement. Information about the existence of previous liens on particular items of property is of limited social as distinct from private value, by which we mean simply that the information is not likely to be disseminated widely. There is consequently no reason to give it special encouragement by overlooking carelessness in its collection and expression. Where as in this case the defendant makes the negligent misrepresentation directly to the plaintiff in the course of the defendant's business or profession, the courts have little difficulty in finding a duty of care. Prosser and Keeton on the Law of Torts, *supra*, § 107, at p. 747.

There is no serious doubt about the existence of a causal relationship between the misrepresentation and the loan. Greycas would not have made the loan without Proud's letter. Nor would it have made the loan had Proud advised it that the collateral was so heavily encumbered that the loan was as if unsecured, for then Greycas would have known that the probability of repayment was slight. Merely to charge a higher interest rate would not have been an attractive alternative to security; it would have made default virtually inevitable by saddling Crawford with a huge fixed debt. To understand the astronomical interest rate that is required to make an unsecured loan a paying proposition to the lender when the risk of default is high, notice that even if the riskless interest rate is only 3 percent, the rate of inflation zero, the cost of administering the loan zero, and the lender risk-neutral, he still must charge an annual interest rate of 106 percent if he thinks there is only a 50 percent chance that he will get his principal back.

Proud argues, however, that his damages should be reduced in recognition of Greycas's own contributory negligence, which, though no longer a complete defense in Illinois, is a partial defense, renamed "comparative negligence." *Alvis v. Ribar*, 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d

886 (1981); see *Wolkenhauer v. Smith,* 822 F.2d 711, 717 (7th Cir.1987). It is as much a defense to negligent misrepresentation as to any other tort of negligence. *Luciani v. Bestor,* 106 Ill.App.3d 878, 889, 62 Ill.Dec. 501, 510, 436 N.E.2d 251, 260 (1982); *McAfee v. Rockford Coca-Cola Bottling Co.,* 40 Ill.App.3d 521, 526, 352 N.E.2d 50, 55 (1976); Prosser and Keeton on the Law of Torts, *supra,* § 108, at p. 750. On the issue of comparative negligence the district court said only that "defendant may have proved negligence upon the part of plaintiff but that negligence, if any, had no causal relationship to the malpractice of the defendant or the damages to the plaintiff." This comment is not easy to fathom. If Greycas was careless in deciding whether to make the loan, this implies that a reasonable investigation by Greycas would have shown that the collateral for the loan was already heavily encumbered; knowing this, Greycas would not have made the loan and therefore would not have suffered any damages.

But we think it too clear to require a remand for further proceedings that Proud failed to prove a want of due care by Greycas. Due care is the care that is optimal given that the other party is exercising due care. See *McCarty v. Pheasant Run, Inc.,* 826 F.2d 1554, 1557 (7th Cir.1987); *Davis v. Consolidated Rail Corp.,* 788 F.2d 1260, 1265 (7th Cir.1986) (both cases applying Illinois law). It is not the higher level of care that would be optimal if potential tort victims were required to assume that the rest of the world was negligent. A pedestrian is not required to exercise a level of care (e.g., wearing a helmet or a shin guard) that would be optimal if there were no sanctions against reckless driving. Otherwise drivers would be encouraged to drive recklessly, and knowing this pedestrians would be encouraged to wear helmets and shin guards. The result would be a shift from a superior method of accident avoidance (not driving recklessly) to an inferior one (pedestrian armor).

 So we must ask whether Greycas would have been careless not to conduct its own UCC search had Proud done what he had said he did—conduct his own UCC search. The answer is no. The law normally does not require duplicative precautions unless one is likely to fail or the consequences of failure (slight though the likelihood may be) would be catastrophic. One UCC search is enough to disclose prior liens, and Greycas acted reasonably in relying on Proud to conduct it. Although Greycas had much warning that Crawford was in financial trouble and that the loan might not be repaid, that was a reason for charging a hefty interest rate and insisting that the loan be secured; it was not a reason for duplicating Proud's work. It is not hard to conduct a UCC lien search; it just requires checking the records in the recorder's office for the county where the debtor lives. See Ill.Rev.Stat. ch. 26, ¶ 9–401. So the only reason to backstop Proud was if Greycas should have assumed he was careless or dishonest; and we have just said that the duty of care does not require such an assumption. Had Proud disclosed that he was Crawford's brother-in-law this might have been a warning signal that Greycas could ignore only at its peril. To go forward in the face of a known danger is to assume the risk. See, e.g., *Davis v. Consolidated Rail Corp., supra,* 788 F.2d at 1266–67 (Illinois law); *Phillips v. Croy,* 173 Ind.App. 401, 405, 363 N.E.2d 1283, 1285 (1977). But Proud did not disclose his relationship to Crawford.

 The last issue concerns the amount of damages awarded Greycas. In estimating what Proud's negligence had cost Greycas, the judge relied heavily on the state court's finding that Greycas's lien was subordinate to other liens. Proud complains that it was wrong to give collateral estoppel effect to a finding in a case to which he was not a party. But we do not understand the district judge to have been using the judgment to prevent further inquiry into the question of Greycas's damages. The state court's judgment determining the priority of the liens was merely some evidence of the degree to which Proud's misconduct had injured Greycas; for the injury depended on the size of the perfected liens that were prior to its lien.

No one tried to prevent Proud from proving, if he could, that the judgment in the state court was erroneous and that Greycas's lien had actually enjoyed the priority that Proud had represented it to have. Proud offered no such evidence. His attack on the state court judgment must fail.

We are aware that, with immaterial exceptions, see Fed.R.Evid. 803(23); Clayton Act § 5(a), 15 U.S.C. § 16(a), civil judgments are said not to be usable in subsequent proceedings as evidence of the facts underlying the judgment; for as to those facts, the judgment is hearsay. See 4 Weinstein's Evidence ¶ 803(22)[01], at 803–353 (1985); McCormick on Evidence § 318, at p. 894 (3d ed. 1984). Since judgments are often given conclusive effect in subsequent litigation, through the doctrines of res judicata and collateral estoppel, it is a little hard to understand why they should not be allowed to have merely evidentiary effect, if for some reason not all the requirements of res judicata or collateral estoppel are fulfilled. A practical reason for denying them evidentiary effect is, however, the difficulty of weighing a judgment, considered as evidence, against whatever contrary evidence a party to the current suit might want to present. The difficulty must be especially great for a jury, which is apt to give exaggerated weight to a judgment. The analytical difficulties posed by efforts to use a judgment as evidence are, however, the only good reasons offered for the rule (others are canvassed in McCormick on Evidence, *supra*, § 318, at p. 894), and as they are of less or no force where, as in this case, the trial is not to a jury, we are not sure the rule should apply in such cases. A further point is that a judgment, insofar as it fixes property rights, should be admissible as the official record of such rights, just like other documents of title, on which see Fed.R.Evid. 803(14); *Sanitary District v. U.S. Fidelity & Guaranty Co.*, 392 Ill. 602, 611–12, 65 N.E.2d 364, 368 (1946). That was the use made of it by Greycas and the district judge: the state court judgment fixed Greycas's rights, equivalent to title, in Crawford's farm machinery. In addition, there is always the catch-all exception to the hearsay rule to fall back on. See Fed. R.Evid. 803(24). "A [hearsay] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness" is admissible, subject to conditions that in fact are satisfied here.

There is still another path to the same conclusion: it should make no difference to Greycas's rights against Proud whether the state court judgment is erroneous. And if that is irrelevant, then the judgment is not being offered as hearsay at all. Greycas should not be penalized because a state court may have found the previous liens to be even more extensive than Proud's search, if he had conducted a search, would have revealed. If the injury to Greycas was a joint act of Proud and the state court, Proud is fully liable under conventional principles. If the state court judgment had been made up out of whole cloth—if there had been no prior liens when Greycas's lien was filed—then the search would have turned up nothing, and it could be argued therefore that Greycas would have gone ahead and have made the loan and have been burned just as badly as it was, but through no fault of Proud. But Proud was free to show this, since the state court judgment was put in merely as evidence of the status of Greycas's liens; and it was admissible for that purpose.

■ There are, finally, the discrepancies not only between Exhibit A and Exhibit B, but between those two exhibits on the one hand and the list of machinery attached to the state court's judgment fixing the priority of liens on the other. The judge resolved the first set of discrepancies by refusing to allow Greycas to claim damages with respect to any piece of machinery not on both lists. He resolved the second—and this is the focus of Proud's protest—on the basis of summaries prepared by Greycas's lawyers which purport to identify the same items on both lists, even though the items are sometimes called by different names (e.g., "sprayer" and "spreader"). Proud complains that the summaries did not meet the test for admissibility of summaries in the Federal Rules of Evidence. See Rule

1006. Such a complaint has a hollow ring in a bench trial. A district judge can be trusted in general, and in this particular instance, to give evidence its proper weight without regard to the technical rules of evidence, see McCormick on Evidence, *supra*, § 60, at pp. 153–54, which insofar as they relate to matters of probative force rather than to privilege are designed primarily for the control of juries. The summaries are basically just a matching of the descriptions in the two lists. They made it easier for the judge to compare the descriptions of each pair of items and decide whether they were probably referring to the same piece of machinery, only differently described. We can find no clear error in his comparisons.

Proud complains because the judge, in valuing the items, used the highest of three appraisals that Greycas had obtained before making the loan. The judge then subtracted 20 percent of that value, on the theory that that was the best estimate of the depreciation of the machinery between the date of the appraisal and the date of Crawford's default. He refused to use the price obtained at the auction, conducted six months after the default; that price was much lower. It is possible to argue that the appraisal the judge used was too high, or the 20 percent depreciation figure too low, or the auction price a better estimate of the value six months earlier; but such disagreements are rarely the stuff of clear error, and they are not here.

It may seem that the judge was, if anything, unduly generous to Proud, in giving Greycas only the value of the collateral on the date of default, rather than the unpaid principal of the loan. But for Proud's misrepresentations, Greycas would not have made the loan, so its damages are not just the collateral but the entire uncollectable portion of the loan together with the interest that the money would have earned in an alternative use. Evidently, though, Greycas has been able to recover some of its principal out of other assets of Crawford's estate; for it originally asked the district court for the unpaid balance of the loan, and only later amended its complaint to ask just for the value of the collateral on the date of the default. Of course if Greycas had hopes of recovering out of the other assets of the estate more than the difference between the unpaid balance of the loan and the value of the collateral, there would be a serious question whether it had actually sustained the full damages that it is seeking in this action. It claims, however, that the other assets are worth less than this difference, and while Proud contests this claim, the district court did not commit clear error in taking Greycas's side in the dispute. We therefore conclude that the realizable value of Greycas's collateral on the date of Crawford's default was a real loss.

A final point. The record of this case reveals serious misconduct by an Illinois attorney. We are therefore sending a copy of this opinion to the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois for such disciplinary action as may be deemed appropriate in the circumstances.

AFFIRMED.

BAUER, Chief Judge, concurring.

I am in agreement with the majority opinion. I believe that Proud would be liable without reference to legal malpractice or negligent misrepresentation. The evidence in this case indicates that he is guilty of fraud or intentional misrepresentation. He was lying when he represented that he had made U.C.C., tax and judgment searches on his brother-in-law's farm. He intended the misrepresentation to induce Greycas to make a loan to his brother-in-law; Greycas justifiably relied upon the misrepresentation in making the loan and was injured as a result. Under these facts, Proud's misrepresentation was indefensible.