In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 16-2983

OAKLAND POLICE & FIRE RETIREMENT SYSTEM, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MAYER BROWN, LLP,

*Defendant-Appellee*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 6742 — **Robert W. Gettleman** *Judge*.

---

ARGUED MARCH 30, 2017 — DECIDED JUNE 28, 2017

---

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal began with a $1.5 billion (with a "b") mistake in documenting a commercial transaction. The central question is who might be held legally responsible for that mistake. General Motors, represented by the Mayer Brown law firm, entered into two separate secured transactions in which the JP Morgan bank acted as agent for two different groups of lenders. The first loan (structured as a secured lease) was made in 2001 and the second in 2006. In

2008, the 2001 secured lease was maturing and needed to be paid off. The closing for the 2001 payoff required the lenders to release their security interests in the collateral securing the transaction. The big mistake was that the closing papers for the 2001 deal accidentally also terminated the lenders' security interests in the collateral securing the 2006 loan. No one noticed—not Mayer Brown and not JP Morgan's counsel.

But after General Motors filed for bankruptcy protection several months later in 2009, General Motors and JP Morgan noticed the error. Although the security for the plaintiffs' 2006 loan had been terminated, the plaintiffs in this case (members of the consortium of lenders on the 2006 loan) were not informed until years later. These lenders brought this suit asserting legal malpractice and negligent misrepresentation. But they sued not JP Morgan or its law firm, who would seem to be the most obvious defendants under the circumstances, but borrower General Motors' law firm—Mayer Brown.

The district court dismissed for failure to state a claim, holding that Mayer Brown did not owe a duty to plaintiffs, who are third-party non-clients. *Oakland Police & Fire Retirement System v. Mayer Brown, LLP*, No. 15 C 6742, 2016 WL 3459714, at *6 (N.D. Ill. June 22, 2016). Plaintiffs appealed, arguing that Mayer Brown owed them a duty of due care. Plaintiffs offer three theories: (a) JP Morgan was a client of Mayer Brown in unrelated matters and thus not a third-party non-client; (b) even if JP Morgan was a third-party non-client, Mayer Brown assumed a duty to JP Morgan by drafting the closing documents; and (c) the primary purpose of the General Motors-Mayer Brown relationship was to influence JP Morgan. We agree with Judge Gettleman that Mayer Brown

did not owe a duty to plaintiffs under any of these theories. We affirm the judgment dismissing the case.

I.  *Factual and Procedural History*

We begin with the terms of the two transactions that led to this case and the mistake that might cost plaintiffs a great deal of money. We then review briefly the relevant portions of other lawsuits associated with this case.

A.  *The 2001 Synthetic Lease*

A syndicate of lenders represented by JP Morgan entered into a secured financial agreement with General Motors in 2001 for $300 million. We call this transaction the 2001 Synthetic Lease. General Motors was represented by Mayer Brown in negotiating, documenting, and closing the deal. JP Morgan was represented by the Simpson, Thacher, and Bartlett law firm. The arrangement required General Motors to sell twelve real estate properties to the lenders, who then leased those same properties back to General Motors. In essence, General Motors secured a loan with its real estate properties. The security interests were perfected by UCC-1 financing statements. On October 31, 2008, the lease matured, and General Motors was scheduled to pay the remaining balance of the lease—$150 million.

B.  *The 2006 Term Loan*

In 2006, General Motors borrowed $1.5 billion from a different group of over 400 lenders, including plaintiffs Oakland Police and Fire Retirement System and the Employees' Retirement System of the City of Montgomery. Again, JP Morgan acted as agent and held the security interests. The collateral for the loan was recorded in a UCC-1 financing statement. We refer to this as the 2006 Term Loan. The 2001 Synthetic Lease

and 2006 Term Loan were secured by different real estate properties for the benefit of two different groups of lenders.

C. *Mayer Brown's Mistake*

In the month leading up to the maturity date, General Motors instructed Mayer Brown to prepare the documents to pay off the 2001 Synthetic Lease. At closing, when General Motors paid the $150 million balance, JP Morgan, as agent for the lenders, would release the real estate serving as security. Mayer Brown prepared a closing checklist and drafted the relevant documents, including a UCC-3 termination statement. A termination statement is a filing required to terminate a security interest that has been perfected by a UCC-1 filing. See 6 Del. Code §§ 9-509 & 9-513 (Delaware enactment of Uniform Commercial Code §§ 9-509 & 9-513). According to plaintiffs' complaint, Mayer Brown mistakenly included the unrelated 2006 Term Loan UCC-1 document as one of the financing statements to be terminated in paying off the 2001 Synthetic Lease.

Mayer Brown thus prepared a UCC-3 termination statement for the collateral for the $1.5 billion Term Loan. Mayer Brown provided the draft to JP Morgan's counsel to review. Without catching the error, JP Morgan authorized the release of the collateral. Consequently, the $1.5 billion security interest for the plaintiff's 2006 Term Loan was released along with the security interests for the remaining $150 million in the 2001 Synthetic Lease.

The plaintiffs' complaint offers the following autopsy of the error, which we accept for purposes of the motion to dismiss: a senior Mayer Brown partner was responsible for supervising the work on the closing. He instructed an associate

to prepare the closing checklist. The associate, in turn, relied on a paralegal to identify the relevant UCC-1 financing statements. As a cost-saving measure, the paralegal used an old UCC search on General Motors and included the 2006 Term Loan. Another paralegal tasked with preparing the termination statements recognized that the 2006 Term Loan had been included by mistake and informed the associate of the problem, but he ignored the discrepancy. The erroneous checklist and documents were then sent to Simpson Thacher for review. The supervising partner at Mayer Brown never caught the error, nor did anyone else. With JP Morgan's authorization, the 2001 Synthetic Lease payoff closed on October 30, 2008.

D. *The General Motors Bankruptcy*

In June 2009, less than a year after the 2001 Synthetic Lease payoff, General Motors filed for bankruptcy protection. Between October 2008 and June 2009, however, General Motors continued to follow the terms of the 2006 Term Loan. Only during the bankruptcy proceedings did someone discover that the UCC-3 termination statement had been filed in error for the collateral securing the 2006 Term Loan. Plaintiffs allege that JP Morgan chose not to tell the lenders. However, the bankruptcy court ordered General Motors to repay the 2006 Term Loan with interest, and General Motors complied in July 2009. The bankruptcy court thus treated the lenders as if they were still secured lenders, subject to the Creditors' Committee's right to challenge the perfection of the security interest. *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A.* (*In re Motors Liquidation Co. I*), 486 B.R. 596, 615, 617–18, 648 (Bankr. S.D.N.Y. 2013).

Adversary proceedings followed in the bankruptcy case. General Motors creditors alleged that the 2006 Term Loan security interest had been terminated so that the lenders for the 2006 Term Loan (plaintiffs) were not secured lenders and should have to repay the money they had received. The bankruptcy court found that the security interest had not been terminated, and the decision was appealed to the Second Circuit.

E.  *Second Circuit Decision*

In 2015, after certifying the key issue of state law to the Delaware Supreme Court, the Second Circuit reversed the bankruptcy court and held that the 2006 Term Loan security interest had in fact been terminated when the UCC-3 statement was filed. *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A.* (*In re Motors Liquidation Co. II*), 777 F.3d 100, 105–06 (2d Cir. 2015). The court held that JP Morgan knowingly terminated the security interest when it approved the filing. Thus, while the release was mistaken, it was still enforceable. *Id.* at 105. In 2015, plaintiffs were served with process in the adversary proceeding. Plaintiffs say this was the first notice of the error they received. After the Second Circuit decision, the creditors amended their complaint in the proceeding to "claw back" the 2006 Term Loan principal and interest payments to lenders like plaintiffs. As far as we know, those proceedings are still pending.

F.  *Plaintiffs' Malpractice and Misrepresentation Claims in Federal Court*

From plaintiffs' account of the situation, it is easy to see why they might have claims against JP Morgan and/or Simpson Thacher, but that is not this case. Instead, these plaintiffs

filed this putative class action against Mayer Brown. They allege that Mayer Brown committed malpractice and negligent misrepresentation. *Mayer Brown*, 2016 WL 3459714. They seek to hold Mayer Brown liable for the damages resulting from the erroneous release of the wrong security interest. The plaintiffs assert that Mayer Brown owed them a duty of care, breached that duty, and caused them harm. The district court dismissed the amended complaint and granted the defendant's motion to dismiss for failure to state a plausible claim. The court held that under controlling Illinois law, Mayer Brown did not owe a duty of care to the plaintiffs, who were not its clients but parties adverse to Mayer Brown's client in the loan transaction.

II. *Analysis*

A. *Standard of Review*

We review *de novo* a dismissal for failure to state a claim, and we accept as true the facts alleged in the plaintiffs' consolidated complaint, but not alleged legal conclusions. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463, 465 (7th Cir. 2010), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Hickey v. O'Bannon*, 287 F.3d 656, 657–58 (7th Cir. 2002). Rule 12(b)(6) requires the complaint to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To rise above the "speculative level" of plausibility, the complaint must make more than "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements." *Iqbal*, 556 U.S. at 678. The plausibility requirement, however, "does not impose a probability requirement," and the claims may proceed even if they seem unlikely to succeed. *Twombly*, 550 U.S. at 556.

B.  *Legal Malpractice and Negligent Misrepresentation*

Plaintiffs brought two claims in district court—legal malpractice and negligent misrepresentation. The parties agree that Illinois law governs. See *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 646 F.3d 487, 490 (7th Cir. 2011). Both claims require plaintiffs to establish that Mayer Brown owed a duty to them. See *Nelson v. Quarles & Brady, LLP*, 997 N.E.2d 872, 880 (Ill. App. 2013), quoting *Fox v. Seiden*, 887 N.E.2d 736, 742 (Ill. App. 2008) (claim of legal malpractice is available when "the defendant attorney owed the plaintiff client a duty of due care arising from an attorney-client relationship"); *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 335 (Ill. 2006) (claim for negligent misrepresentation under Illinois law requires "a duty on the party making the statement to communicate accurate information"). We begin and end with the issue of duty.

Whether an attorney or law firm owed a duty to someone can depend on the facts, but in this case the issue can be decided as a matter of law on a motion to dismiss. See *In re Estate of Powell*, 12 N.E.3d 14, 20 (Ill. 2014); *Orr v. Shepard*, 524 N.E.2d 1105, 1110 (Ill. App. 1988); cf. *Jewish Hosp. of St. Louis v. Boatmen's Nat'l Bank of Belleville*, 633 N.E.2d 1267, 1275 (Ill. App. 1994) (observing that the question of duty "is always a question of law" that requires "consideration of all the circumstances").

In the vast majority of legal malpractice cases, the plaintiff was a client of the defendant-attorney, and the direct attorney-client relationship establishes the attorney's professional duties to the client. *Pelham v. Griesheimer*, 440 N.E.2d 96, 99 (Ill. 1982). There is a small corner of legal malpractice law, however, in which Illinois recognizes that attorneys owe professional duties to persons who are not their clients. In *Pelham*, the Illinois Supreme Court provided its most comprehensive discussion of these situations that are exceptions to the general rule. *Id.* at 99–101. *Pelham* held that an attorney may owe a duty to a third party when "the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." *Id.* at 100. Examples of third parties to whom attorneys owe a duty include third-party beneficiaries of wills, third-party beneficiaries of wrongful death actions, and third-party recipients of formal opinion letters. See *In re Estate of Powell*, 12 N.E.3d at 21; *Geaslen v. Berkson, Gorov & Levin, Ltd.* (*Geaslen II*), 613 N.E.2d 702, 704 (Ill. 1993); *McLane v. Russell*, 546 N.E.2d 499, 504 (Ill. 1989).

In this case, the plaintiffs are attempting to expand these exceptions to impose a duty on the lawyer for one party in a commercial transaction to the counterparty and even to the counterparty's principals in a separate transaction. In the Synthetic Lease payoff, Mayer Brown represented General Motors, not JP Morgan or its principals in the Synthetic Lease, let alone its principals in the 2006 Term Loan. As noted above, plaintiffs offer three theories to support this expansion of Illinois law. First, they argue that JP Morgan was actually a "longstanding and current client" of Mayer Brown so that they can rely on the general rule in favor of actual clients without relying on *Pelham*. Second, the plaintiffs interpret *Pelham* to include an exception to the primary purpose rule so that

the limits of *Pelham* do not apply. Third, plaintiffs argue that even if *Pelham* applies, it is satisfied because the primary purpose of General Motors' employment of Mayer Brown was to influence JP Morgan. We take each argument in turn.

### 1.   *Attorney-Client Relationship*

Plaintiffs argue that their claim is within the mainstream of legal malpractice law because JP Morgan was actually a client of Mayer Brown at the time of the 2001 Synthetic Lease payoff, but for different matters. Plaintiffs reason that Mayer Brown thus owed a duty of care to JP Morgan and (indirectly) to them as its principals. Plaintiffs do not argue that Mayer Brown represented them or their agent JP Morgan in the closing of the 2001 Synthetic Lease payoff or the 2006 Term Loan. Rather, plaintiffs argue that Mayer Brown breached a duty it owed to JP Morgan *as a client* in other matters, despite the fact that the alleged harm resulted from a matter unrelated to the matters in which Mayer Brown actually represented JP Morgan.

That is an astonishing claim. As a matter of course, large modern law firms use mechanisms such as conflict-waiver agreements and ethics screens to represent many clients in transactions and litigation in which their clients are adverse to one another. Plaintiffs have not alleged that Mayer Brown's representation of General Motors in a transaction with JP Morgan as the counterparty presented an unwaived conflict of interest, as it obviously would have been without a valid waiver. We would be flabbergasted if JP Morgan did not sign a conflict-waiver agreement with Mayer Brown with respect to this transaction. See Ill. R. Prof'l Conduct 1.7 (prohibiting a lawyer from undertaking representation directly adverse to another client without informed consent). Further, ethics

screens are used regularly in law firms to protect client interests and confidential information when one arm of the firm undertakes representation that may be adverse to clients represented by another arm of the firm. We are not surprised that, as plaintiffs allege, Mayer Brown simultaneously represented JP Morgan in a multi-jurisdictional transaction with Liz Claiborne and also represented General Motors across the table from JP Morgan in the transactions at issue in this case. Scenarios like this are routine, at least so long as clients consent and firms honor the mechanisms to prevent sharing of clients' confidential information.

Illinois law recognizes as much. It categorizes such "clients" as third parties with adverse interests in the matter at hand. For example, in *Fitch v. McDermott, Will & Emery, LLP*, a law firm simultaneously represented a man (Fitch) in planning his own estate while also representing his mother's estate, of which the son was a beneficiary. 929 N.E.2d 1167, 1183–84 (Ill. App. 2010). The son brought a claim against the law firm for legal malpractice, arguing that it should have advised him about his mother's estate. The court found that no such duty existed because the son was only a third-party nonclient with respect to the law firm's representation of his mother's estate, even while he was also a client in another matter, his own estate planning. *Id.* at 1184–85. This reasoning applies here.

Consider the consequences of the rule plaintiffs advocate, that a law firm owes a duty of care to a party adverse to its client because the adverse party is a client in unrelated matters and has waived the conflict of interest. If plaintiffs' theory held water, the law firm would continue to owe a duty of care to look out for the adverse party's interests, in conflict with its

duties to its client in the matter at hand. The law firm would then face an impossible and unwaivable conflict of interest. Plaintiffs' theory thus conflicts with the rules of professional conduct that allow such waivers (and that, as a practical matter, have allowed law firms to grow as large as they have in recent decades). See generally Ill. R. Prof'l Conduct 1.7 (Conflict of Interest: Current Clients), 1.8 (Conflict of Interest: Current Clients: Specific Rules), 1.9 (Duty to Former Clients), and 1.10 (Imputation of Conflicts of Interest: General Rule).

Under Illinois law, the scope of the attorney's duty to a client is limited by the representation sought. *Simon v. Wilson*, 684 N.E.2d 791, 801 (Ill. App 1997). Plaintiffs have not alleged that they sought and obtained Mayer Brown's counsel for the 2001 Synthetic Lease payoff—nor, of course, the separate 2006 Term Loan transaction in which they were involved. Like the plaintiff in *Fitch*, these plaintiffs were third-party non-clients with respect to the Mayer Brown-General Motors attorney-client relationship. Plaintiffs' argument to the contrary is inconsistent with Illinois law.

### 2.  *Attorney Duties to Third-Party Non-Clients*

As noted, the general rule is that an attorney owes a professional duty only to the attorney's client, not to third parties. *First Nat'l Bank of Moline v. Califf, Harper, Fox & Dailey*, 548 N.E.2d 1361, 1363 (Ill. App. 1989). *Pelham* states the standard in Illinois on the issue of attorney duty to third-party non-clients in both legal malpractice and negligent misrepresentation claims. See, e.g., *Auto-Owners Ins. Co. v. Konow*, 57 N.E.3d 1244, 1247–48 (Ill. App. 2016) (relying on *Pelham* rule); *Kelley v. Carbone*, 837 N.E.2d 438, 441 (Ill. App. 2005) (same); see also *Greycas, Inc. v. Proud*, 826 F.2d 1560, 1563–65 (7th Cir. 1987) (same). *Pelham* teaches that in Illinois, "a duty owed by the

defendant attorney to the nonclient" is established only when "the intent of the client to benefit the nonclient third party was the primary or direct purpose of the transaction or relationship." *Pelham*, 440 N.E.2d at 99. "In cases of an adversarial nature, in order to create a duty on the part of the attorney to one other than a client, there must be a clear indication that the representation by the attorney is intended to directly confer a benefit upon the third party." *Id.* at 100.

### a. *No Exception to the Primary Purpose Rule*

In an attempt to avoid the *Pelham* rule and its consequences, plaintiffs assert that *Pelham* contains an exception to the "primary purpose" rule and imposes an attorney duty of care to third-party non-clients when the attorney voluntarily undertakes to perform a service with foreseeable reliance on the performance. See *id.* at 101 ("We believe a different situation would confront us if this complaint had alleged sufficient facts to show that the defendant had undertaken a duty … because his client and the plaintiffs herein could have justifiably relied on that undertaking."); *Auto-Owners Ins.*, 57 N.E.3d at 1248 (acknowledging that *Pelham* left this possibility open, but not relying on it for its decision). Here, plaintiffs' theory is that Mayer Brown voluntarily undertook responsibility for drafting the UCC-3 termination statements and that plaintiffs could justifiably rely on Mayer Brown's actions. We are not persuaded. The "different situation" hypothesized in *Pelham* was obiter dictum, not controlling law, but more important, the theory does not fit the plaintiffs' factual allegations here.

First, courts that have considered the *Pelham* dictum on voluntary undertaking also applied the primary purpose test. See, e.g., *Geaslen v. Berkson, Gorov & Levin, Ltd.* (*Geaslen I*), 581

N.E.2d 138 (Ill. App. 1991), *aff'd in part & rev'd in part*, *Geaslen II*, 613 N.E.2d 702. For example, in *Geaslen I*, the court held that an opinion letter drafted by a lawyer for a non-client may give rise to a duty. *Id.* at 142. The court reasoned that although the scope of the larger relationship between the defendant law firm and its client was not to benefit the plaintiff, the primary purpose test could be applied to the individual task of producing an opinion letter at the direction of the client for the benefit of the third-party plaintiff. *Id.* However, the court relied on the primary purpose test explicitly in its holding: "the primary purpose of the letter of opinion was to benefit plaintiffs." *Geaslen II*, 613 N.E.2d at 703. Accord, *Greycas*, 826 F.2d at 1562–63 (borrower's attorney who provided opinion letter assuring lender that collateral had no prior liens owed duty of care to lender).

Thus, there is no exception to the primary purpose rule. The relationship between Mayer Brown and the plaintiffs here simply is not similar to those presented in *Geaslen I* and *Geaslen II*. Preparing the closing checklist and UCC-3 termination documents is not akin to an opinion letter that is prepared at the direction of a client for the specific purpose of providing comfort to a third party. Opinion letters are written to allow non-clients to rely on them. That's their purpose.

Even if we examine only document drafting rather than the full scope of Mayer Brown's representation, as plaintiffs urge, the primary purpose of the document preparation was not similar in nature to the primary purpose of an opinion letter. As noted at oral argument, in every complex transaction like the loan and payoff between General Motors and JP Morgan, one party or another must prepare the first draft of every

document. By preparing a first draft, an attorney does not undertake a professional duty to all other parties in the deal. The fact that the Mayer Brown drafts were provided to Simpson Thacher for review indicates that the drafts prepared by Mayer Brown were simply that—drafts—not a legal opinion to be relied upon by other parties. We must also note that, when provided an opportunity to review the Mayer Brown drafts, a Simpson Thacher attorney replied, "Nice job on the documents." *In re Motors Liquidation Co. II*, 777 F.3d at 105.

In sum, there is no exception to the *Pelham* primary purpose rule, and there is no plausible allegation that Mayer Brown voluntarily assumed a duty to plaintiffs by providing drafts to Simpson Thacher for review.

> b. *Types of Attorney Duties to Third-Party Non-Clients*

Including the recipients of opinion letters as in *Geaslen*, the Illinois Supreme Court has recognized only three types of non-clients able to establish that they are the primary beneficiaries of an attorney's relationship with another client and thus are owed a duty of care. First, "an attorney who brings a wrongful death action owes a legal duty to the decedent's beneficiaries at the distribution of funds phase of the action." *In re Estate of Powell*, 12 N.E.3d at 21, citing *Carter v. SSC Odin Operating Co.*, 976 N.E.2d 344 (Ill. 2012); *DeLuna v. Burciaga*, 857 N.E.2d 229 (Ill. 2006). Second, an attorney owes a duty of care to the intended beneficiaries of wills. *McLane*, 546 N.E.2d at 502–04. Third, an attorney owes a duty of care to third-party recipients of formal opinion letters authored by the attorney at the direction of the attorney's client. *Geaslen II*, 613 N.E.2d at 704.

Plaintiffs argue that even if their first two arguments fail, they can still satisfy the *Pelham* primary purpose rule. They assert that the primary purpose of Mayer Brown's representation of General Motors was to influence JP Morgan. Thus, plaintiffs reason, their relationship with Mayer Brown is akin to the types of relationships in which the Illinois Supreme Court has found an attorney duty to a third-party non-client. The argument is creative but we believe it runs contrary to Illinois law.

We find persuasive another decision by Judge Gettleman, who also authored the district court decision in this case. In *Freedom Mortgage Corp. v. Burnham Mortgage, Inc.*, 720 F. Supp. 2d 978 (N.D. Ill. 2010), he held that the facts alleged presented one of the rare instances satisfying the primary purpose rule in *Pelham*. In *Freedom Mortgage*, a lender claimed that a title company's attorney who had performed faulty title searches and prepared inaccurate closing documents for the loan owed the third-party lender a duty. *Id.* at 990–92. Because the lawyer's "work was nonadversarial in the sense that an attorney's services as a closing agent are typically relied upon by all parties to a real estate transaction," the plaintiff had pled sufficiently that the primary purpose and intent of the attorney's work was to influence the plaintiff with respect to the real estate transaction. *Id.* at 991.

In contrast, neither the Illinois courts nor the federal courts in Illinois have recognized another situation in which an attorney owes a third party a duty. For example, in *Gold v. Vasileff*, an Illinois court observed that an "attorney owes a duty to a non-client only in the most limited circumstances." 513 N.E.2d 446, 448 (Ill. App. 1987). There, the buyers of a grocery store alleged that the sellers' attorney "had knowledge that

the sellers would not perform [under the contract] and failed to share this knowledge with the buyers." *Id.* The court held on the pleadings that the sellers' attorney owed no duty to the plaintiff-buyers. *Id.*

Similarly, in *First National Bank of Moline*, the court found that a borrower's law firm owed no duty to the lending bank. 548 N.E.2d at 1363–64. The plaintiff lender sought damages for negligent preparation of the mortgage by the borrower's attorney. The plaintiff was unable to establish that the primary purpose and intent of the borrower-attorney relationship was to benefit the bank, even though the bank would ultimately derive some benefit from the loan by collecting interest. *Id.* at 1363. The court affirmed dismissal on the pleadings, observing that nothing prevented the bank from having its own counsel review the documents at issue. Such legal expenses, the court noted, were just part of "the costs of doing business." *Id.* at 1364.

Here, plaintiffs allege that "General Motors' primary purpose and intent in engaging Mayer Brown to prepare the Synthetic Lease Closing Documents was to effect the Synthetic Lease Payoff by influencing JPMorgan to execute and/or approve the Synthetic Lease Closing Documents prepared by Mayer Brown." The factual allegations contained in the complaint contradict that conclusory allegation about the primary purpose of the General Motors-Mayer Brown relationship. While the complaint characterizes the transaction as the mere formal, non-adversarial completion of a previously negotiated transaction, the complaint characterizes similar transactions as sophisticated and complex. We assume that the terms of the 2001 Synthetic Lease payoff were clear and unambiguous, and that the responsibilities of both parties were agreed

to previously. Yet each party had a distinct interest in ensuring that the other fulfilled its duties. Thus, while plaintiffs further allege a "common interest" in closing the transaction, the facts do not support the conclusory claim that the transaction lacked "any adversity." There is no plausible allegation that Mayer Brown was attorney to the transaction where the two principal parties each had the advice of their own lawyers.

The alleged relationship between Mayer Brown and plaintiffs here is easy to distinguish from *Freedom Mortgage* and other cases in which a court found an attorney owed a duty to a third party. The natural and reasonable reading of the facts alleged is, as the district court stated, "GM hired defendant for its own benefit—to ensure that all of its property was properly released as security pursuant to the terms of the 2001 lease agreement." *Mayer Brown*, 2016 WL 3459714, at *5. JP Morgan, in turn, hired its own counsel, Simpson Thacher, to protect the lenders' interests in ensuring that the security was not released until full payment was made. Accordingly, Mayer Brown was not an "attorney to the transaction" like the closing agent in *Freedom Mortgage*. It was instead representing the interests of its client. It simply is not plausible to infer otherwise.

Plaintiffs "cannot avoid the mandates of *Pelham* by couching their grounds for recovery in principles that have not been accepted in delineating the duty of an attorney to his clients and nonclients." *Orr*, 524 N.E.2d at 1108. Plaintiffs cannot escape the application of *Pelham* by claiming to be in an attorney-client relationship with Mayer Brown or asserting that Mayer Brown voluntarily undertook a responsibility triggering a duty. The plaintiffs' relationship to Mayer Brown is like

those attorney–third-party relationships in *Gold* and *First National Bank of Moline*. They were represented by counsel who were not prevented from reviewing the documents and had no valid justification for relying on Mayer Brown's drafts. Plaintiffs have not plausibly alleged that the primary purpose of General Motors' relationship with Mayer Brown was to influence JP Morgan.

Because plaintiffs cannot establish a duty between Mayer Brown and JP Morgan, our analysis stops here. We do not need to address the additional step plaintiffs would need to take to show that Mayer Brown owed a duty to JP Morgan's principals (the plaintiffs) in a transaction entirely separate from the 2001 Synthetic Lease closing. The judgment of the district court dismissing this action is

AFFIRMED.